[Crim. No. 11316. In Bank. Apr. 9, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT DOUGLAS HILL, Defendant and Appellant.

682

Robert L. Fitzpatrick, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—A jury found defendant guilty of murder in the first degree and fixed the penalty at death. Defendant's motion for a new trial was denied, and a motion to vacate the order denying a new trial based on newly discovered evidence was also denied. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

*Facts*: Phyllis Jane Black, the victim, and her husband, Richard James Black, lived at 11780 Encino Avenue, Granada Hills, in Los Angeles County. They had been married about two years and were expecting their first child. On August 3, 1966, when Mr. Black returned home from work about 7:10 p.m. he found his wife's dead body in the hallway. He usually entered the house by unlocking the front door with his key. The front door was open about 6 inches. There was no evidence that the house had been forcibly entered. On the kitchen sink were a glass and an ice cube tray of water. Mr. Black estimated that his wife had between $30 and $50 in cash. Her purse and wallet, which were on a desk in the front hall, contained no bills.

Mrs. Black's dress was torn and pulled up around the neck. Her brassiere and panties were near her legs. There was a welt around her throat, which, in the opinion of the police, was caused by her garment having been rolled up and used as a ligature to strangle her. There was evidence of a struggle in the hallway, as some of the curlers in Mrs. Black's hair were compressed into the carpeting, and there was a lipstick stain on the carpet between her shoulder and the wall.

The autopsy revealed that death was caused by strangulation by means of a ligature, such as a rope or cloth tied around the neck. The vaginal and anal canals contained the

fluid of human semen, and the coroner testified that an act of intercourse and sodomy had taken place either shortly before or after her death. In the opinion of the coroner, Mrs. Black had been dead at least three hours and could have been dead as long as five or six hours before 7 p.m. Mr. Black testified that he had not had intercourse with his wife within 24 hours prior to finding her body.

A dermatologist had been treating Mrs. Black for a rash on the soles of her feet and palms of her hands and had prescribed Castellani's Paint, a peeling agent that causes the outer layer of skin to flake off. The paint, a deep lavender color, was to be applied to the affected area every night. Mrs. Black's left heel was discolored with lavender.

When defendant was booked, his clothing was vacuumed for debris. From the area of his pants from the knee to the waist around the fly, debris similar in color to the discoloration on the victim's heel was found. Upon analysis, a criminologist determined that the debris was keratinized epithelial, the outer cells of the skin in a dried callous condition, of the same material and discoloration as the skin of Mrs. Black's heel.

The Black residence was situated at the end of the street at a cul-de-sac. The house is set back about 150 feet from the street, with a driveway between the Schmid house on the right and the Green house on the left of the driveway entrance. Mrs. Schmid left her house by car at 1:15 p.m. to take her children for a swimming lesson from 1:30 to 2:15 p.m. Shortly after their return, she saw a man outside the window in front of her house, walking down the cul-de-sac coming from between the Green and Black houses. He was dressed in dark trousers and a white shirt that was "bloused out." His trousers were low-slung, and his dark blond hair was messy. She went outside to see where he was going. By this time she could see him from the waist up; he wasn't running but was moving fast. That evening she told the police about having seen the man. She said the time was 2:50 p.m. because she looked at the clock when she got home. The following evening she picked defendant out of a lineup as resembling the man who walked by her window. She identified him at the trial, noting that he was thinner and paler than when she had first seen him.

Defendant's palm prints matched those found in the. hallway of the Black house. A policeman assumed the position of Mrs. Black's assailant . on the hallway floor, and it was demonstrated that the palm prints on the wall could not have

been made from a standing position. A policewoman assumed a face-down position on the hallway rug, and the area of her mouth fit the lipstick stain on the rug.

Mr. and Mrs. Black had a stereo unit installed in their living room by the House of Sight and Sound, which had been delivered by defendant and another employee about the middle of July 1966. Their house was equipped with an intercom system and the Blacks were not interested in installing external speakers for the stereo.

In addition to other publicity, the August 4, 1966, edition of the Los Angeles Times, some of which editions were on the streets on August 3, and the final morning edition that was on the streets during the early morning hours of the 4th carried publicity about the murder, but no mention was made of fingerprints having been found. Neither did the August 4 edition of the Herald-Examiner distributed in the morning mention fingerprints. The night final of the Herald-Examiner, which came out about 1:45 in the afternoon, carried the following paragraph for the first time: ''Numerous fingerprints were discovered at the scene. Friends and relatives will be asked for fingerprint examples in order to eliminate innocent prints from among evidence, police said.''

About 6 p.m. on August 4, 1966, Lt. Gillen of the Los Angeles Police Department who was in charge of the investigation of Mrs. Black's murder, received a call from defendant, saying that he had been at the Black residence on August 3 to service a stereo and had been in several rooms in the house. He was requested to come to the station for the purpose of giving his fingerprints and a statement. After giving his name and address, he said that he was employed by the House of Sight and Sound in Van Nuys as a T.V. and stereo repairman and had been with them about five months. On August 3 he had about eight service calls to make in the Van Nuys area, and decided to make an unsolicited complimentary service call on Mrs. Black, whose stereo he had delivered some 30 to 60 days earlier. He parked his company's Ford Econoline panel truck in front of the driveway to the Black house and the one next to it. He got there about 1 p.m. Mrs. Black admitted him. She was wearing a blue muu-muu and had curlers in her hair. He serviced the stereo by adjusting the knobs, and Mrs. Black mentioned installing remote speakers in the master bedroom from the stereo set. They went to the bedroom, where they discussed placement of the speakers. After five or six minutes he asked her if he could use the bathroom, and she directed

him to the one near the front door. After coming from the bathroom, he looked down the hall and saw Mrs. Black in the kitchen and asked for a drink of water. She gave him some water in an old fashioned glass, took an ice tray out of the refrigerator, and put ice in his drink. He had a second glass of water, and after further discussion about the weather he walked down the hallway to the front door and told Mrs. Black that if she was interested in external speakers to call him.

Lt. Gillen asked defendant if there was anything else he wanted to tell them, and defendant said, ''Yes. I want you to know that I did get an undesirable discharge from the Army for a charge arising over a burglary'' that involved a tavern in Montecito.[1]

When defendant mentioned his involvement in a burglary, Lt. Gillen, knowing that money was missing from Mrs. Black's purse, gave defendant the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Thereafter he questioned defendant further about his activities on August 3, and a recorded statement was taken by Lt. Gillen and Sgt. O'Donnell. Defendant said his company had not sent him on a service call to the Blacks. It suddenly occurred to him to go there because he was in the vicinity, and he remembered Mrs. Black because she was such a vivacious person. He also thought it would enhance his image with the company to perform a complimentary service for a customer. When asked where his fingerprints might be found, defendant did not mention that he might have placed his hands on the wall in the hallway, nor did he mention any activity in the hall. He was asked if he noticed anything in the hallway, and replied that he recalled seeing a woman's purse lying on the table but did not recall the color other than it was dark.

He said he left the Black residence about 1:30 p.m., stopped at a root beer stand, and drove to his next call at 22308 Park Street in Newhall, arriving about 2 or 2:05. He was there about 30 minutes and then returned to Sight and Sound between 3 and 3:30. He unloaded his truck, did a little paper work, was sent out on another call to Studio City, came back to the shop about 5 p.m., and was picked up by his wife at 5:30 p.m.

Other testimony showed that defendant was at the Park

---

[1]This portion of Lt. Gillen's testimony was heard out of the presence of the jury.

Street address in Newhall at 3:08 p.m. A 14-year-old girl, who was visiting her sister and brother-in-law at that address, was watching a T.V. program when defendant approached and turned off the program at that time. The timing was substantiated through a representative of a local T.V. station who was required to keep a station log of programs at that time. The driving time from the Black residence to the Park Street address was less than 15 minutes. Consistent with Mrs. Schmid's testimony that she had seen defendant coming from the direction of the Black house at 2:50 p.m., defendant could have arrived at the Park Street address about 3:08 p.m.

No one saw defendant's truck parked in front of the Black's driveway. There were no cars or trucks parked there either when Mrs. Schmid left or when she returned. The space between the Schmid and Black driveways was so narrow that anyone parked there would block both driveways. A reasonable inference to be drawn was that, to avoid identification, defendant parked the company truck elsewhere and walked to and from the Black house. The jury was also asked to infer that defendant heard Mrs. Schmid return and that he left the Black's front door ajar to make his exit quietly.

Phyllis Katz, who worked at the House of Sight and Sound, testified that on the afternoon of August 3, 1966, she was in a coffee shop next door about 5:20 p.m. when defendant came in and sat down with her and her friend. He ordered a Coke and left in about 10 minutes. She noticed a tear in the front of his white shirt just below the shoulder; defendant was usually a fairly neat dresser but he "looked messy"; he was usually quite talkative, but he appeared dazed and just stared out the window. During the conversation between herself and her friend, the subject of medical operations was discussed and she said to defendant, "I hope this isn't making you sick," to which he replied, "No, I have seen a lot worse."

At the trial, defendant could not remember what time he arrived at the Black residence although he was wearing a watch, and he could not remember the sequence of his calls on August 3, 1966, except the ones just before and after his call on Mrs. Black. Although he testified that he thought it would enhance his position with the company if a customer would call in and compliment his service, he could not remember whether he told Mrs. Black his name. He had no explanation for the speck of lavender-stained skin found in the fly area of his trousers. He denied having touched Mrs. Black, having sexual relations with her, or killing her. He denied having

told the police on the telephone that he had read there were fingerprints at the scene and that was his reason for telephoning.

At the penalty trial the evidence showed that defendant had been convicted of burglary in the second degree on November 27, 1961, and was committed to the Youth Authority. He was convicted of automobile grand theft on December 18, 1963, and was sentenced to one year in the county jail. Lt. Gillen testified that defendant told him that as a result of the November 1961 burglary he received an undesirable discharge from the Army. Defendant was committed to the Youth Authority in February 1962 and was assigned to a forestry and conservation camp at Ben Lomond where he remained 10 days and then escaped. He was subsequently apprehended and returned to Deuel Vocational Institution, having been at large from March to July 1962. At the vocational institution he received training and was released on parole on July 10, 1963. His parole terminated when he was sentenced on the grand theft auto charge.

Dr. Norman I. Barr undertook a psychiatric evaluation of defendant on October 13, 1966, through interviews with defendant, his wife, his parents and grandparents. He was given the Minnesota Multi-Phasic Personality Inventory Test. From the results of that test and his interviews, Dr. Barr concluded that defendant was suffering from a passive-aggressive personality disturbance. The illness can be treated but does not respond readily or easily to treatment. With time, there is a good chance that any individual would respond to treatment. The passive-aggressive personality will react to stress in a passive fashion until the point is reached where the person is convinced a passive reaction is unsuccessful, at which time he will react aggressively in excess of normal.

*Questions*: First. *Was defendant denied his constitutional right to effective counsel?*

*No.* Defendant's basic complaint is that his retained counsel did not give his full ability and attention to the case because he was under indictment in another case. He concedes, however, that he was fully aware of his counsel's predicament and nevertheless chose to retain him after a full exposition of the facts and an express opportunity by the court before trial to obtain other counsel.

When a defendant asserts that his constitutional right to adequate representation by competent counsel has been vio-

lated, the burden of sustaining the allegation rests upon him. (*People* v. *Downer,* 57 Cal.2d 800, 813 [16] [22 Cal.Rptr. 347, 372 P.2d 107]; *People* v. *Watson,* 244 Cal.App.2d 89, 96 [5] [52 Cal.Rptr. 821]; *People* v. *Lugo,* 220 Cal.App.2d 54, 58-59 [2] [33 Cal.Rptr. 572].) To justify relief when an attack is made of inadequate representation, ''it must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or sham.' [Citations.] It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled. [Citations.]'' (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [3-4] [34 Cal.Rptr. 863, 386 P.2d 487].) It is not enough that defendant alleges omissions of counsel indicating lack of preparation and general incompetence. He must show that such acts or omissions resulted in withdrawal of a crucial defense from the case. (*People* v. *Kirchner,* 233 Cal.App.2d 83, 86 [1] [43 Cal.Rptr. 218].)

 There is clearly no merit to defendant's contention that his counsel had not properly researched the law. He claims that when his counsel ''wanted to cite a case for a legal argument in support of a motion for an advised verdict, he did not have the page number.'' The record shows that counsel cited a case by name and volume. It is apparent that either counsel or the court had the volume in the courtroom, as the judge read aloud passages from the opinion and obviously had no difficulty finding the page number from the index. Defendant further claims that his counsel ''did not know the name of the case cited in *People* v. *Collins* upon which he wanted to rely in another phase of the same argument.'' As the judge was reading aloud, he quoted the point of law, with a citation from another case, that defense counsel was relying on, and counsel said, ''That is the case I had reference to.'' Equally without merit is his contention that his counsel's citations to the California Reporter, instead of the official California Reports, demonstrated incompetency.

 Defendant complains of the failure of defense counsel during the penalty phase to ask a proper question of his expert psychiatrist on the subject of whether he would be able to be a productive member of society to some degree even though he was incarcerated. The psychiatrist answered that the question was not clear to him, and counsel withdrew the question. After an off-the-record consultation with the psy-

chiatrist, counsel concluded the examination of the psychiatrist. Withdrawing the question was obviously a tactical decision on the part of defense counsel, and defendant fails to demonstrate any prejudice resulting therefrom. In *People* v. *Brooks,* 64 Cal.2d 130, 140 [9] [48 Cal.Rptr. 879, 410 P.2d 383], we said: ". . . In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel. [Citations.] "

■ Defendant complains that his counsel did not submit written instructions for the consideration of the court prior to argument of counsel. The record does not bear out this contention. While he did not prepare any special instructions, he did submit numbers of CALJIC instructions. The district attorney had furnished the court with a complete set of instructions. The trial court considered and thoroughly discussed all the instructions submitted by both counsel. Defendant has set forth no omitted instructions that would have aided the jury or that withdrew a possible defense from the case.

■ Defendant further complains that his counsel failed to interview witnesses prior to the trial and failed to call a defense witness who would have supported his statement that he had made previous unsolicited and unscheduled courtesy calls other than to Mrs. Black's residence. Defendant was permitted to supplement his trial counsel's argument during the hearing on his motion for a new trial, and when this point was raised by him the court pointed out that at the time of the trial defendant was unable to testify as to any witness for whom he had made a courtesy call, nor could he name a single witness at the time of the motion for a new trial, weakly asserting that his wife knew of the witness and had told his counsel. The trial court pointed out that defendant had been in daily contact with his wife throughout the trial and could have ascertained the name of the witness. Defendant then admitted that his counsel had talked with the witness and thought she was not a good witness.

■ To sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call him. (*People* v. *Lugo, supra,* 220

Cal.App.2d 54, 59 [3].) ▮▮ Defendant has failed to name any material defense witnesses whom counsel failed to interview or call. Whether defendant might have been able to produce a witness who would testify that he had made another unscheduled courtesy call was not crucial to his defense. It was undisputed that defendant was at the Black residence the day of the murder, and it was undisputed that he was not sent there by his company. Whether he had made other complimentary service calls on other persons on other occassions was not material in deciding his guilt or innocence of the murder of Mrs. Black on August 3, 1966.

▮▮ Defendant's complaint that trial counsel, because of his involvement in criminal proceedings, was unable to devote sufficient time to his defense comes too late. He was given every opportunity to be relieved of any possible prejudice resulting from the engagement of his retained counsel. Had the trial court exerted pressure on defense counsel to withdraw, defendant would no doubt now be claiming that it was prejudicial error to refuse him the right to continue with counsel of his choice. At the time of the motion for a new trial, defense counsel informed the court that defendant was displeased with his representation and that defendant wished to be substituted as his own counsel. This latter motion was denied, the court noting that defendant "is represented by counsel and by very capable and competent counsel." However, as heretofore mentioned, defendant participated in the argument at the hearing on the motion for a new trial, and the court did not give any credence to the charges of incompetency made by defendant. Eventually, Mr. Iler was relieved as counsel of record, and new counsel was substituted, who made a motion to vacate the order denying a new trial and challenged the imposition of the sentence of death.

▮▮ Second. *Did the court abuse its discretion in denying defendant's request to personally argue to the jury at the penalty trial?*

*No.* Defense counsel opposed his client's request, and the district attorney pointed out that defendant would be unable to keep his argument within legal bounds, noting that defendant had elected not to take the witness stand at the penalty trial. ▮▮ The trial court's discretion in denying defendant's request is fully supported in *People* v. *Mattson*, 51 Cal.2d 777 [336 P.2d 937], where this court said: ". . . despite constitutional (art. I, § 13) and statutory (Pen. Code, § 686) provisions that defendant has the right to appear and

defend in person *and* with counsel, defendant is not entitled to have his case *presented* in court *both by himself and by counsel* acting at the same time or alternating at defendant's pleasure. [Citations.] So long as defendant is represented by counsel at the trial, he has no right to be heard by himself. . . . [Italics in original.]

" . . . . . . . . . . . . . "We are not saying that the trial court may not in its discretion, upon what it may determine to be good cause shown, permit a party who is represented by counsel to participate in the conduct of the case . . . or permit a defendant who appears in propria persona to employ an attorney to sit by him and advise him during the presentation of the case in court, or even appoint an attorney (with the latter's consent) to render such advisory services to an indigent defendant who wishes to represent himself (see, e.g., *People* v. *Chessman* (1951), supra, 38 Cal.2d 166, 174 [2] [238 P.2d 1001]). These matters are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause. The court, however, should not permit a litigant both to have counsel and to actively participate in the conduct of the case (as by conducting examination of witnesses, interposing objections, arguing points of law or of fact, *addressing the jury,* etc.) *unless the court on a substantial showing* determines that in the circumstances of the case *the cause of justice will thereby be served* and that the orderly and expeditious conduct of the court's business will not thereby be substantially hindered, hampered or delayed." (Italics added.) (P. 789 [2], 797 [24-25].)

Section 1095 of the Penal Code, which reads in part: "If the offense charged is punishable with death, two counsel on each side may argue the cause," is not in point and does not conflict with the above-stated rules that it is within the sound discretion of the court to deny the request of a defendant who is represented by counsel to actively participate in the conduct of his case and that "defendant is not entitled to have his case *presented* in court *both by himself and by counsel* acting at the same time or alternating at defendant's pleasure." (*People* v. *Lopez,* 60 Cal.2d 223, 255 [35] [32 Cal.Rptr. 424, 384 P.2d 16]; *People* v. *Mattson, supra,* 51 Cal.2d 777, 789 [2], 797 [24-25].) Defendant here did not request two counsel to argue; rather, his request was that he, instead of his counsel, argue to the jury. He has

failed to show wherein the cause of justice would be served had his request been granted. (*People* v. *Darling*, 58 Cal.2d 15, 19-20 [1-5] [22 Cal.Rptr. 484, 372 P.2d 316].)

Third. *Were defendant's statements to the police inadmissible?*

*No.* Defendant contends that his initial statements to the police were improperly admitted into evidence because they were obtained in violation of his right to counsel, in that he was not *timely* informed of his constitutional rights. He makes no contention that the warnings subsequently given to him by the police were inadequate; rather, he contends that suspicion had focused on him from the time he telephoned the police department and volunteered the statement that he had been at the Black residence the day of the murder.

There is no merit to this contention. The trial court held a full hearing on this issue out of the presence of the jury before the prosecution's opening statement and determined that defendant was not a suspect at any time prior to the time he was given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974.].

About 6 p.m. the day after the murder, defendant telephoned Lt. Gillen and told him that he had been in the Black residence the day of the murder and had read in the newspaper that the police had fingerprint evidence. He said that he had been there to service a stereo and had been in several places in the home. Lt. Gillen asked him what rooms he had entered, and defendant said that he had been in the bedroom, bathroom, living room and kitchen. Lt. Gillen asked him if he would come to the station for the purpose of obtaining his fingerprints so they could eliminate them from the prints they had on hand and also to give a statement to them regarding his being in the home. Defendant said that he would have his father drive him to the station in half an hour.

Lt. Gillen testified that up until that time he had never seen defendant or heard his name. Defendant arrived at the station at 6:30 that evening and was asked his name, address, telephone number and employment. He was then asked to describe his activities on the day in question. He related his activities on the day of the murder up until the time he said good-bye to Mrs. Black at the door. At that point Lt. Gillen asked: "Is there anything else you want to tell us that can help us pertaining to this?" Defendant said, "Yes. I want you to know that I did get an undesirable discharge from the

Army for a charge arising over a burglary that involved a tavern in Montecito." Lt. Gillen immediately told defendant that he had a right to remain silent; that if he chose not to remain silent anything he said could be and would be used against him in a court of law; that he had a right to an attorney to be present at his interrogation; that if he was unable to afford an attorney, one would be appointed for him free of charge, to be present before the questioning continued. He asked defendant if he understood these rights, and defendant said yes. Lt. Gillen said, "Do you wish to waive them and talk to us?" Defendant said, "Yes."

Lt. Gillen testified that defendant became a suspect when he stated that he had a prior record for burglary because of the money that was missing from Mrs. Black's purse. Lt. Gillen testified that until defendant mentioned his criminal record, he appeared to have a legitimate reason for being in the home on that date. Up until the time that defendant mentioned his criminal record, he was free to go; however, from that point on, he was not free to leave.

The initial statements made by defendant prior to receiving the required warnings of his constitutional rights were not in response to in-custody interrogation designed to elicit incriminating information. Defendant had volunteered to give a statement as to his activities in the Black home, and the police merely afforded him the opportunity of accounting for his presence there. It was only after defendant had indicated that he had a criminal record that the police, as a precaution to preserve the admissibility of any statements they might obtain, warned defendant of his constitutional rights.

■■■■ Fourth. *Did the court err in denying defendant's motion to vacate the order denying a new trial?*

*No.* In support of the motion to vacate the order denying a new trial, an affidavit was filed by Gene Earl Davis,[2] who had pleaded guilty and had been convicted of the first degree murder of Cheryl Cummings, stating that he had killed Mrs. Black. In an investigation by the district attorney, Gene

---

[2] The affidavit reads: "COMES Now your Affiant, GENE DAVIS, deposes, swears, affirms as follows:

"My name is GENE DAVIS. I am presently a prisoner in the Los Angeles County Jail. My Booking Number is 424-045. I am presently awaiting to be transfered [sic] to the State Penitentiary to begin serving a life term for the murder of Cheryl Cummings.

"On or about August 3rd, 1967 [sic], I entered the residence of Phillis·[sic] Black. I obtained entrance by posing as a magazine salesman. While in her house, I grabbed [sic] her from behind, dragged her into a hall, choked her, raped her, thought she was dead and started to

Davis gave a statement under oath, in the presence of his counsel.

At the hearing on the motion, Gene refused to answer certain questions on the ground that it might tend to incriminate him, but answered others. He testified that on August 3, 1966, he was driving a car belonging to Mrs. Ruth Galberth and that he went to the Black residence about 2:45 p.m. He pretended to be a magazine salesman but did not have a pencil, pad or clip board. He did not know Mrs. Black by name but had followed her home from a shopping center about a week and a half before on a Saturday. She was 5'5" tall, had light brown hair and freckles, which "you couldn't notice from far away." He grabbed her from behind around the neck with his right forearm. Mrs. Black pleaded with him and told him that she had money in her purse. Davis dragged her down the hall; she passed out, and as she fell her muu-muu ripped. He removed her brassiere and panties, which he kept and later threw away but did not remember where. He had intercourse with her, turned her over, and had rectal intercourse with her. He said that his feet were closer to the front door than his head, and he kept looking over his shoulder toward the front door to see if anyone was coming. He testified that he took $38 out of her purse but did not remember whether it was in a wallet, coin purse, or loose. He left around 3:30 or 3:45, and afterward went to a Texaco station where his brother, Donald, worked. He told his brother that he had raped and killed a girl.

After his tape-recorded statement to the district attorney was played for the court, Gene Davis was brought to the stand for further cross-examination. He testified that he did not kill Mrs. Black; his testimony in court that he was

---

leave. On my way out, I noticed her purse in the hall, opened it up removed approximately Thirty-eight dollars ($38.00), left by the front door and walked towards my car.

"I would be willing to testify to the foregoing on behalf of Robert Douglas Hill, the Defendant, in the above entitled action.

"I have not been threatened or promised anything to make the foregoing statement.

"I am aware of my rights. I am aware of the fact that I have a right to have counsel present at all times. I am aware of the fact that if I cannot afford an attorney, one will be provided for me. I am also aware of the fact that anything I say may be used against me. I hereby wave [sic] my rights.

"I swear under penalty of perjury, that the foregoing to the best of my recollection and knowledge is true and correct.

"Dated this 6th day of April, 1967.

/s/ Gene E. Davis
GENE DAVIS"

responsible for her death was not true; the reason for his false testimony was "Because I am against the death penalty, and I figured I could cause enough commotion so the people will vote against it." He testified that his statement to the district attorney was false; that he got the information about the details of the death of Phyllis Black from the Los Angeles papers, which he read in jail during defendant's trial. He denied having received any of the details of his court testimony from defendant. He testified that his affidavit was not true.

When asked who had given him the information that Mrs. Black had freckles that were not visible except on close observation, he refused to answer. He also refused to answer where he had obtained information about the floor plan of the Black house and the route to the Black home. He refused to answer questions about his source of information about the purse in the entry hall. When asked about his knowledge of the names of the streets near the Black residence, he testified that he was "up in that area in 1964," but admitted he did not know that there were no streets in that area in 1964.

At this point in the hearing, defendant moved to withdraw his motion to vacate the order denying him a new trial. The prosecution objected to the withdrawal of the motion on the ground that the matter should be fully aired in public. The court denied the motion to withdraw, saying: "We have been in attendance here on this matter, this is the fourth day. We have heard testimony from many witnesses, we have had hundreds of pages of testimony, and I am in accord with Mr. Light's statement that this is a matter of considerable gravity. It involves the death penalty, and we can't just summarily grant this belated motion on the part of the defendant to withdraw the motion to set aside the prior order of the Court denying the defendant's motion for new trial. So, you may proceed with the testimony."

When the testimony of Gene Davis was resumed, he once again decided to change his story and testified that defendant had given him the details of the Black murder on three different occasions in the county jail when Davis told defendant that he would take the blame. Defendant told him about Mrs. Black's freckles and described her clothing; he gave Davis a diagram of the house and told him to testify about taking $38 from Mrs. Black's purse. Davis testified that he actually rehearsed his examination with another prisoner who acted as a district attorney.

It also developed that if Davis would take the blame for Mrs. Black's death, defendant would sue the county and/or state, keep $20,000 for himself, and give the rest to Davis. Davis testified that defendant said he would have his attorney ''draw up a contract'' to this effect.

Donald Davis, Gene's brother, who was also in jail at the same time as Gene and defendant, testified that at one time it was common knowledge throughout the county jail that if defendant were exonerated of the murder of Phyllis Black he would be able to sue the county and collect some money. He testified that Gene sent him a note, delivered by a trusty, saying, ''Hill promised us if I cut him loose that he would sue the County and the State and pay us off for it.''

When it was obvious that Gene's testimony was doing defendant more harm than good, his brother Donald was called to corroborate parts of Gene's testimony before he repudiated his confession. He was also called by the People in rebuttal to discredit Gene's testimony that he had told Donald that he was responsible for Mrs. Black's death. Both Donald and Gene had been charged with the murder of Cheryl Cummings. They were in the county jail at the same time, and at times were transported in the same bus between the jail and the courts. They communicated verbally, by sign language, and by notes delivered by trusties or other inmates of the jail. Gene pleaded guilty to the Cummings murder and received a life sentence. Donald was tried later, and his trial was still in progress at the commencement of the hearing on defendant's current motion to vacate the order denying a new trial. He had also filed an affidavit in support of defendant's motion, but the affidavit was withdrawn, and after his trial was over he testified at the current hearing.

The story that someone other than defendant had murdered Mrs. Black reached the newspapers on or about March 28, 1967, and as part of the ensuing investigation both Donald and Gene made statements to the district attorney. In part Donald's statement was that on the afternoon of August 3, 1966, Gene had come to the Texaco station where Donald worked and told him that he had killed a woman; that Donald didn't believe Gene; that at another time Gene had told Donald that he murdered Janice Storem; and that Donald told Gene to implicate him in the Storem murder. In his testimony for the People, Donald was asked why he wanted Gene to ''tell this story implicating you in the Janice Storem death,'' to which he replied: ''Later on I could prove where

he was lying in this whole matter and try to deal with the District Attorney in Santa Monica on my case.''

At the time Donald offered to support defendant's current motion to vacate the order denying a new trial, his own trial was just starting and he didn't know what the verdicts would be. In the event he received the death penalty, he reasoned that if he helped defendant, defendant's attorney would help him. He testified: ''Well, it was to my understanding the ACLU moves in whenever a death penalty is given. I figured if I would help [defendant's counsel], then if I was given the death penalty he would help me.'' Donald did not receive the death penalty, and it may be assumed that his zeal to help defendant had diminished by the time he testified at the current hearing. When called by defendant's attorney, he testified that everything in his affidavit was false. When asked if Gene told him what to say in his affidavit, he replied, ''He gave me a few words to say, like he had killed, saying my brother did kill Phyllis Black and he came to the service station where I worked and told me. Then I added a few things to it.'' He said he made up the statement that Gene had said, ''Now, I've got three; this one is different than any of the others. I am going to outdo the Boston strangler.''

Having heard the testimony of fourteen prosecution and five defense witnesses over a period of six full days, the trial court denied the motion to vacate the order denying a new trial. ██ The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court, and in determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. (*People* v. *Williams,* 57 Cal.2d 263, 270 ██ [18 Cal.Rptr. 729, 368 P.2d 353].)

██ Disregarding entirely Gene Davis' recantation of his so-called confession, it was clear to the trial court that Gene was not responsible for Mrs. Black's death, and there was no newly discovered evidence warranting the granting of a new trial. In too many instances, the so-called confession was contrary to the evidence. Mrs. Black's panties and brassiere were found next to her body; her body was discovered in a position exactly opposite to that testified to by Davis; his testimony as to the location of her purse and its visibility in the hallway was contrary to the evidence and photographs of the interior of the Black residence; his testimony that he had followed Mrs. Black home on a Saturday

about a week and a half before the day of the murder was contradicted by his employer's testimony that he was working that day; his testimony as to distances from which the Black residence was visible was contrary to undisputed physical evidence; and the falsity of his testimony as to the car he was driving was established by the owner of the car. His fingerprints did not match any in the Black residence.

The trial court's conclusion that Gene Davis' affidavit and his testimony were not worthy of belief was buttressed by other untrue statements. He testified that he had also killed Janice Storem on July 17, 1966. Besides Davis' mistake as to the date of that crime, the Chief of Police of Los Angeles testified that there were eight specific instances wherein his testimony did not coincide with known facts about the death of Janice Storem, which case, as of that time, had not been litigated.

In ruling on the motion, the trial court said: "So, in conclusion, in connection with this motion, the confession, so-called, of Gene Davis, who has been convicted of first degree rape and murder of Cheryl Cummings for which he is presently undergoing a life sentence, that he strangled, killed and then raped Phyllis Black, is unworthy of any credence or belief.

"He is a psychopathic and psychological liar. His initial confessions to killing Phyllis Black and Janice Storem were fabrications, preposterous and irrational. They were so wholly unfounded that even Gene Davis completely repudiated those confessions."

The weight and credibility to be attached to the affidavit and testimony in support of defendant's motion was for the trial judge, and defendant has failed to demonstrate any error or abuse of discretion. (*People* v. *Jefferson,* 47 Cal.2d 438, 446 [13] [303 P.2d 1024]; *People* v. *Gaines,* 204 Cal.App. 2d 624, 628-629 [3, 5] [22 Cal.Rptr. 556].)

Fifth. *Was defendant deprived of due process by the trial court's denial of his motion for leave to introduce oral testimony on the issue of the unconstitutionality of the death penalty?*

*No.* After the motion for new trial had been denied and the time for sentencing arrived, defendant filed a written "Objection to Imposition of Judgment of Death and Motion for Leave to Introduce Evidence; Points and Authorities." Points and Authorities in Opposition were filed by the prosecution. The trial court gave thorough consideration to

both the offer of proof of the oral testimony and the arguments of counsel in answer to three questions: (1) Can a defendant urge unconstitutionality of the death penalty statute by way of a motion in arrest of judgment? (2) Is the defendant entitled to introduce all expert testimony to support his contention that the death penalty is unconstitutional? (3) Is Penal Code section 190.1, the death penalty statute, unconstitutional? After hearing argument, the trial court determined that the objection to the death penalty by way of a motion in arrest of judgment was available to defendant.

After an exhaustive offer of proof of all the proposed testimony and extensive legal arguments on the propriety of introduction of oral testimony in support of the objection to the death penalty and the constitutionality of capital punishment, the trial court ruled: "The written motions, points and authorities, and offers of proof filed by defense counsel included therein numerous cases and authorities. Supplementing those documents, the argument of counsel encompassed additional offers of proof. This obviates the necessity of the taking of any additional oral testimony as to the matters referred to by counsel in his offer of proof. That, together with the decisions that the Court has referred to. Although this courtroom is the proper forum for defense counsel to present legal arguments, citations, and voice their objections to the constitutionality of the statute which imposes the death penalty, the observations and opinions of penologists, criminologists, physicians, sociologists, psychiatrists, historians, chaplains, and clergymen expounding their ideologies and philosophies in opposing the death penalty or on the issue of the death penalty, well-intentioned and considered though they may be, should be addressed to our legislative bodies.

"The proposed oral testimony of the experts would in substantial measure be cumulative and would merely supplement the material and arguments already presented and considered by this Court.

. "Therefore, the request of defense counsel for the taking of additional—for the taking of oral testimony in support of the issue of constitutionality is denied."

For the reasons set forth in the majority opinion of this court in *In re Anderson,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117], sections 190 and 190.1 of the Penal Code are valid, the death penalty is constitutional, and the trial court's denial of defendant's request to introduce oral testimony in

support of his objection to the death penalty therefore did not deprive him of due process of law.

 Sixth. *Was defendant deprived of a trial by an impartial jury?*

*No.* Defendant contends that the exclusion of veniremen opposed to the death penalty contravenes the rule of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. There is no merit to this contention. The record shows that Mrs. Keep[3] indicated that she had a conscientious opinion which would preclude her from imposing the death penalty irrespective of the evidence in a case, and that Mr. Usselman[4] indicated that he could not be a fair and impartial juror because he could not in conscience impose the death penalty should he find the defendant guilty of murder in the first degree.

The judgment is affirmed.

Traynor, C. J., Mosk, J., Burke, J., and Sullivan, J., concurred.

PETERS, J., Concurring.—

By a four-to-three vote this court has upheld the California procedure involved in the impositon of the death penalty. (*In re Anderson* and *Saterfield,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117].) While I disagreed with the majority opinion, I am bound by it unless or until it is reversed. Solely by compulsion of the majority rule announced in that case, I concur in the judgment.

Tobriner, J., concurred.

---

[3] "THE COURT: And when you say you are opposed to capital punishment, do you mean by that that irrespective of what the evidence in a case was, that you would be unable to return a verdict imposing the death penalty? MRS. KEEP: I believe so, sir. THE COURT: Do you entertain a conscientious opinion which would preclude your imposing the death penalty? MRS. KEEP: I believe that is my feeling, yes."

[4] "THE COURT: Do you know of any reason why you could not serve as a fair and impartial juror to both the defendant and the People of the State of California? MR. USSELMAN: I don't think I could in conscience impose the death penalty. THE COURT: You have conscientious opinions or scruples which would preclude your imposing the death penalty should you find the defendant guilty of murder in the first degree? MR. USSELMAN: Yes."