[Crim. No. 44891. Second Dist., Div. Three. June 28, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WAYNE HAYES et al., Defendants and Appellants.

**COUNSEL**

Ann Kough and Michael J. Udovic, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Susanne C. Wylie and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### FIDLER, J.*—

#### STATEMENT OF THE CASE

In an information filed by the District Attorney of Los Angeles County, appellants/defendants Michael Wayne Hayes, Randall Eugene Ellis and a third codefendant, Daniel Lee George were charged as follows:

In count I a violation of Penal Code section 187, murder. Count I further alleged that in the commission of the offense, a principal was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a); that in the commission of the offense, Hayes personally used the firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1); that the murder of the victim was intentional and carried out by Hayes for financial gain within the meaning of Penal Code section 190.2, subdivision (a)(1); and that the murder was committed while appellants and codefendant George were engaged in the commission of robbery in violation of Penal Code section 211, within the meaning of Penal Code section 190.2, subdivision (a)(17).

Count II charged appellants and codefendant George with the crime of robbery, in violation of Penal Code section 211. Count II further alleged that in the commission of the offense, a principal was armed with a firearm within the meaning of Penal Code section 12022, subdivision (a); that Hayes personally used a firearm within the meaning of Penal Code sections 12022.2 and 1203.06, subdivision (a)(1) and that Hayes intentionally inflicted great bodily injury upon the victim within the meaning of Penal Code section 12022.7.

Appellants' motions to sever their trials were granted. The motion of Hayes to preclude the sanction of the death penalty was denied. The trial court granted Ellis' motion to strike the penalty of life without possibility of parole and, accordingly, struck the special circumstances allegation as to Ellis. Ellis was sixteen years old at the time of the offense, but was being tried as an adult. Appellants were tried by separate juries.

Hayes was found guilty as charged of murder in violation of section 187 of the Penal Code and the jury found the murder to be in the first degree. The jury further found the allegation that a principal was armed with a firearm to be true and the special circumstances allegations that the murder

---

*Assigned by the Chairperson of the Judicial Council.

was committed for financial gain and during the commission of the crime of robbery to be true. Hayes was found guilty of robbery in violation of section 211 of the Penal Code as charged in count II and the jury further found that in the commission of the offense, a principal was armed with a firearm.

Ellis was found guilty of murder in the first degree in violation of section 187 of the Penal Code in count I, and guilty of robbery, a violation of Penal Code section 211, in count II. The jury found the allegations in each count, that in the commission of each offense a principal was armed with a firearm, to be true.

Following the penalty phase of Hayes' trial, the jury affixed the penalty as to count I at life imprisonment without possibility of parole.

Hayes' motion for a new trial was denied, as was probation. As to count I, Hayes was ordered imprisoned in the state prison for the term prescribed by law, life without possibility of parole, plus one year for the armed allegation. As to count II, Hayes was sentenced to state prison. The sentence on count II was ordered to run consecutively to the sentence on count I and was stayed pursuant to the provisions of Penal Code section 654.

Ellis was denied probation and was ordered imprisoned in the state prison for the term prescribed by law, a total of 25 years to life, plus 1 year for the armed allegation on count I. Ellis was also sentenced to state prison on count II. Count II was ordered to run concurrently to count I.

STATEMENT OF FACTS[1]

For the purposes of the issues raised on this appeal the facts may be stated relatively briefly. Hayes and Ellis, along with codefendant Daniel George, were "attempting to pick up some dope" and visit a friend who lived in Monrovia, on the evening of May 23, 1981. The car they were riding in had been stolen a few days earlier by one Jamie Champion who then abandoned it. In a statement to police that he later recanted at trial, Mr. Champion believed he had seen codefendant George in the car. At a later time he also saw appellants with Mr. George.

According to a statement obtained from Ellis after his arrest, appellants and codefendant George decided to commit a robbery after finding their

---

[1]The facts presented at the separate trials of the appellants were essentially the same. The statements of each appellant were introduced only at their respective trials. Where necessary we will indicate where specific evidence was introduced at only one of the trials.

friend was not at home. They then went looking for a liquor store to rob. After finding what they considered a likely target, codefendant George dropped off both appellants and parked the car in a parking lot.

After entering the liquor store, appellants decided that particular store was "not right for robbing." They then entered a bar with the thought of committing a robbery there. Again appellants decided this was the wrong location and left the bar, reentered the car and drove off. Appellants and codefendant George then decided to rob the Kenan Mini-Mart, located at 925 West Foothill Boulevard in Monrovia. The store was owned by Kenneth Smith. Due to the fact that both Mr. Smith and the employee scheduled to work that night were ill, Mr. Smith's son, David, was working in the store, alone, when appellants entered.

Hayes was armed with a .25 caliber automatic that had been given to him by Ellis just before they went into the store. Once the robbery commenced, David Smith cooperated fully with appellants. While Hayes kept the gun on David Smith, Ellis began to empty the cash register. David Smith was face down on the floor. Then, in an extreme act of cowardice and cruelty, Hayes executed David Smith by shooting him three times in the back, from a distance of less than three feet. Appellants then fled the scene, and were arrested a few days later.

Appellants were placed at the scene of the first liquor store they entered, the bar, as well as running from the Kenan Mini-Mart, by numerous eyewitnesses who were able to identify each appellant with varying degrees of certainty.

Monrovia Police Detective Hollis Spillman testified to the statement made by Ellis.[2] Edward Jones, the nephew of Hayes, testified to statements made by Hayes amounting to a complete confession.

Ellis presented no defense. Hayes presented an alibi witness who placed him away from the scene of Kenan's Mini-Mart when David Smith was being shot. Witnesses also testified as to statements from one James Oggs, indicating Mr. Oggs was in possession of the murder weapon, and was expecting to receive a reward.

### CONTENTIONS ON APPEAL

Hayes contends that the trial court erred by not granting a motion for a new trial based on the ground of newly discovered evidence.

---

[2] This statement will be discussed at length in our discussion section II, *infra.*

Ellis contends that (1) the trial court erred by admitting into evidence his statement, obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; and (2) the trial court committed reversible error by giving improper instructions to the jury on the subject of aiding and abetting contrary to the California Supreme Court's holding in *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318].

DISCUSSION

I.

HAYES' MOTION FOR A NEW TRIAL WAS PROPERLY DENIED.

 Hayes raises only one issue on his appeal. He contends that the trial court abused its discretion by failing to grant a motion for a new trial on the grounds of newly discovered evidence pursuant to Penal Code section 1181, subdivision (8). The basis for this contention is as follows:

John Ledesma testified at appellant's preliminary hearing. At the time of Hayes' trial, Ledesma could not be found, and he was declared to be an unavailable witness pursuant to Evidence Code section 240, and his testimony was read to the jury. His testimony was primarily concerned with the identification of Hayes immediately after the killing of David Smith.

Subsequent to Hayes' trial, Ledesma was located in a federal prison in Wisconsin. According to an affidavit filed by Hayes' trial counsel, Ledesma would testify that he (Ledesma) was hired to work at the Kenan Mini-Mart *subsequent* to David Smith's death. Detective Spillman's son was also working there and Detective Spillman often came to the store.

From these facts we are asked to draw the conclusion that Ledesma's proposed testimony was crucial to the defense, for it would show that Detective Spillman lied when he testified that he did not know Kenneth Smith well at the time of David Smith's death. Based on this conclusion we are then asked to draw the inference that if the trial jury had this information they could then conclude that Detective Spillman lied when he testified that he did not threaten Edward Jones, Hayes' nephew, who testified as to Hayes' confession. Mr. Jones testified that Detective Spillman threatened him because of Detective Spillman's friendship with Kenneth Smith.

Ignoring for the moment the Herculean gaps in logic apparent in appellant's argument, Hayes overlooks the following testimony of Mr. Jones on redirect by the deputy district attorney:

"Q. Regardless of that statement (that Detective Spillman threatened to 'blow his head off,' because of the detective's friendship with Kenneth Smith), whether it was made or not made, the things that you said to Mr. Spillman when the tape recorder was going, and the things you told us in court today, were they all the truth?

"A. Yes." It is clear therefore that Ledesma's testimony could not have possibly affected the jury's verdict.

■ The grant or denial of a motion for a new trial on the ground of newly discovered evidence is a matter which lies within the sound discretion of the trial court. In determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background. (*People* v. *Hill* (1969) 70 Cal.2d 678, 698 [76 Cal.Rptr. 225, 452 P.2d 329]; *People* v. *Williams* (1962) 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353]; *People* v. *Randle* (1982) 130 Cal.App.3d 286, 292 [181 Cal.Rptr. 745].)

■ As the court in *Randle, supra,* relying on the decision in *People* v. *Hairgrove* (1971) 18 Cal.App.3d 606 [96 Cal.Rptr. 142], points out, the trial court must consider several factors in ruling on the motion: "(1) that the evidence, and not merely its materiality, is newly discovered; (2) that the evidence is not merely cumulative; (3) that it would render a different result probable on a retrial of the cause; (4) that the party could not with reasonable diligence have discovered and produced it at trial; and (5) that these facts have been shown by the best evidence of which the case admits." (*People* v. *Randle, supra,* 130 Cal.App.3d 286, 292.) ■ Assuming arguendo that factors 1, 2, 4 and 5, *supra,* exist in the instant case, we turn to factor number 3, *supra:* would the "newly discovered" evidence render a different result probable on a retrial of the cause? The answer in this case must be an emphatic no. For as Mr. Jones testified, despite any alleged threats, his testimony concerning appellant Hayes was truthful. The trial court's exercise of discretion in this matter was proper.

## II.

### ELLIS' STATEMENTS WERE FREELY AND VOLUNTARILY MADE.

Appellant Ellis' first argument on appeal is that the trial court erred in admitting into evidence his statement to Detective Spillman. He alleges that the statement was psychologically coerced from him and that his *Miranda* rights were violated. This case arose prior to the passage of Proposition 8, so we must turn to California law where appropriate to resolve this issue.

(See *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

Ellis' first contention, or more accurately the first part of his contention, may be disposed of quickly. He implies that the fact of his age, coupled with the size of the interrogation room (12 feet × 12 feet), and the presence of three police officers, must have led to his eventual confession. The record before us is completely barren of any indication that the size of the interrogation room or the presence of the police officers led to appellant's statements to Detective Spillman. We decline to draw any inference as to some possible psychological coercion, where the record on appeal does not support such an inference, and in fact supports the conclusion that Ellis was in no way coerced into making a statement because of the physical layout of the interrogation room or the number of officers present.

■■ Ellis' second contention provides an issue of more substance. He alleges that once he asserted his *Miranda* rights, the subsequent statements of Detective Spillman in response to his questions were improper and led to his eventual waiver of his *Miranda* rights and his confession.[3] In order to properly resolve this issue we set forth all of the relevant statements, questions and answers of both Ellis and Detective Spillman in the margin below.[4]

---

[3]The record unquestionably supports the fact that Ellis was in custody at the time of his interrogation. Respondent does not contest this point.

[4]"A. Okay. [¶] I read to him the following legal rights:

" 'The following legal rights will be explained to you before any questioning:

" 'One. You have the right to remain silent.' [¶] I then told him: 'That means you don't have to talk to me unless you want to. [¶] 'Anything you say can and will be used against you in court. [¶] 'Three. You have the right to have a lawyer and to have him present with you.' [¶] I wrote, 'before, prior to' and then continued reading: [¶] 'During any questioning now or at any time if you cannot afford a lawyer, one will be appointed for you free of charge.' [¶] I said, [¶] 'Do you understand each of the rights explained to you?' [¶] He said that he did. [¶] I said: [¶] 'You also have the right to have a grandparent or a parent with you, one or both.' [¶] He said he understood that and I said: [¶] 'Would you give up your right to remain silent, your right to have a lawyer and talk to me.' [¶] He said: [¶] " 'I didn't do any murders. I didn't do any robberies. I want to talk to a lawyer.' "'

"Q. All right. And after he said that, what did you do, Mr. Spillman?

"A. I said: [¶] 'That's fine. That is your right. I'm going to have you booked for first degree murder and robbery. One of the gentlemen here will book you. [¶] I'm going to send you down to the Juvenile Hall and I'm going to call the intersept [*sic*] officer in Probation to get you detained and send you downtown.'

"Q. At that point what did you do?

"A. I got up to leave the room and he says, 'you can't do that to me.' I says, 'Not only can I do that to you,' or something to that effect, but I said, 'I'm going to do it to you and I'm also going to get you certified as an adult in this case and so that it doesn't come to any surprise to you, I want you to know what it going to be happening to you.' I said, 'I'll see

It is well established in California that " '[a] suspect who has asserted his rights and prevented further lawful interrogation nonetheless retains the op-

you later,' and started to leave.

"Q. Were you still out of your chair when you said this to him?

"A. Yes. I was.

"Q. And were you heading toward to door of the room?

"A. Yes.

"Q. You made this last statement and headed toward the door and what did he tell you?

"A. He told me basically, I couldn't do that to him; that he hadn't killed anybody and for me to come and go with him and he would show me where the gun was.

"Q. When he said that, what did you say to him?

"A. I told him that I was sorry, but I couldn't talk to him, that he had indicated that he wanted a lawyer and I suggested that he call the public defender and talk to him and see if he should talk to me. I told him at least to call his mother or father or grandparents to see what they felt he should do.

"Q. After you told him that what did he say, if anything?

"A. He said, 'I don't want to talk to a lawyer. I don't want to talk to my parents. I don't want to talk to my grandmother and whether you like it or not, I'm going to tell you. So, you might as well sit down and listen.'

"Q. You mean, he actually told you to sit down and listen to him?

"A. He says, 'I don't care what you do.' He says, 'You're going to hear what I got to say. So, you might as well sit down and listen.'

"Q. And after he said that what did you do?

"A. I told him, Mr. Ellis, that he had refused to waive his rights and the only way I could talk to him is if he fully understood that he was giving up his Miranda rights, his legal rights and that he knew that he had the right to have a lawyer and with that understanding in mind and the understanding that he also had a right to have his parents there or grandparents, because he indicated that he lived with his grandparents and that he fully understood that and he gave them up was the only way I could talk to him and he fully understood what was happening.

"Q. And before talking to him did you read the rights to him from that form that is before you, People's 101?

"A. I didn't read it to him. [¶] I went back over it in great detail and memory with him.

"Q. Would you, again, tell us what exactly you said to him about his rights and what his responses were, if anything?

"A. I told him that: [¶] 'Randall, you have the right to remain silent, which means, hey, you can keep perfectly quiet on this thing and you don't have to say a word, but that means that you don't have to talk to us.' [¶] I said: [¶] 'Anything you say can and will be used against you in a court of law. I want you to know that if you tell me anything at all its— that is going to incriminate you, that I have a right to tell that to the court.' [¶] I told him that: [¶] 'You have a right to have a lawyer and to have him present here during any questioning right now or at any other time that we would talk to you about this and if you cannot afford a lawyer, one would be appointed for you free of charge. [¶] You can call the public defender and you can call any attorney that you know that anybody knows that you want and they can come down here and talk to you before I talk to you. [¶] You can have your mother, your father, both of them, your grandmother or grandfather, all of them here if you want them and you can talk to them before we do.' [¶] I said: [¶] 'Do you understand each of those rights that I've told you?' [¶] He said: [¶] 'Yes. I do understand them.' [¶] I then said: [¶] 'Understanding these rights, are you willing to give up your right to remain silent and talk to us without a lawyer or your parents or grandparents being here?' [¶] He said: [¶] 'Yes. I want to get this thing squared around because I didn't shoot anybody. You cannot throw a first degree murder rap on me because I didn't do it.'

"Q. After he made that statement to you what happened then?

"A. I asked him to tell me about what happened on the night of May the 23rd in the City

tion, thereafter, *voluntarily* to initiate a confession.'" (*People* v. *McClary* (1977) 20 Cal.3d 218, 226 [143 Cal.Rptr. 163, 571 P.2d 620], citing *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406 [118 Cal.Rptr. 617, 530 P.2d 585]; *People* v. *Randall* (1970) 1 Cal.3d 948 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) We must determine whether or not Ellis' eventual statement to Detective Spillman was indeed voluntary, or in fact was a product of improper comments of the detective designed to elicit waivers and a confession.

The trial court found beyond a reasonable doubt that Detective Spillman's comments did not in any sense constitute duress or a violation of *Miranda.* The court further found that the police did not initiate the statements of appellant, and that the statements were freely and voluntarily made, after proper *Miranda* warnings. (See *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672].)

■ As a reviewing court, our duty is to "'"examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found."'" (*People* v. *McClary, supra,* 20 Cal.3d 218, 227.)[5] With respect to conflicting testimony we must accept that version of events which is most favorable to the People. (*Ibid.*)

■ Based upon both the uncontradicted facts, and those in dispute which we resolve in favor of the People, our independent review of the record convinces us that the trial court was correct in its ruling. We are satisfied that Ellis' desire to talk to Detective Spillman was motivated by his desire to exculpate himself from the murder charge, and that Detective Spillman's factual responses to appellant's statements were not an attempt to elicit any statements from appellant, and were therefore permissible. In fact, the record overwhelmingly supports the conclusion that after Ellis had initially exercised his *Miranda* rights, Detective Spillman unequivocally stated to Ellis that he, Spillman, did not wish to speak to him. Spillman eventually acceded to Ellis' demands that he listen to Ellis, and went beyond

---

of Monrovia.

"Q. All right. Did you at that point, then, have a discussion with him and did he reveal certain information to you?

"A. Yes. He did."

[5]During the hearing to suppress his confession, appellant testified that Detective Spillman told appellant he "would see him in San Quentin" and was going to "get me certified as an adult," which is why appellant spoke to the detective. As to the comments concerning San Quentin, both Detective Spillman and another police officer denied those comments were made.

what appellate decisions have required in making sure Ellis understood his rights before speaking to him. It was Ellis who literally insisted on talking.

The record reveals that appellant freely and voluntarily chose to speak to Detective Spillman and initiated the conversation with the detective after initially asserting his rights. *Miranda* does not proscribe a suspect from changing his mind concerning speaking to the police, when his change of heart is a voluntary one, based on factors that do not involve coercion by the police. (*People* v. *McClary, supra,* 20 Cal.3d 218; *People* v. *Randall, supra,* 1 Cal.3d 948; and see *Oregon* v. *Elstad* (1985) 470 U.S. — [84 L.Ed.2d 222, 106 S.Ct. 1285].)

### III.

#### THE BEEMAN ERROR DOES NOT REQUIRE REVERSAL.

■ Ellis argues that because the jury was instructed pursuant to instructions held improper in *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318],[6] his conviction must be reversed.

As opposed to the instructions given in this case, *Beeman,* and the later case of *People* v. *Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], require that an aider and abettor have the "intent or purpose of committing, encouraging or facilitating the commission of the offense, . . ." (*People* v. *Beeman, supra,* at p. 561.)

In order to focus on this issue as presented in the instant case, we must first deal with respondent's contention that our Supreme Court's holding in *Beeman* should not be applied retroactively. This court held in *People* v. *Gilman* (1984) 156 Cal.App.3d 760 [203 Cal.Rptr. 6], that because *Beeman*

---

[6]Modified versions of CALJIC Nos. 3.00 and 3.01 were given as follows:

"3.00. The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof include:

"1. Those who directly and actively commit the act constituting the crime, or [2] those who, with knowledge of the unlawful purpose of the person who directly and actively commits the crime, aid and abet in its commission [or] [3] those who, whether present or not at the commission of the crime, advise and encourage the commission.

"One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged."

"3.01. A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetration of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime.

"Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.

"Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

resolved conflicting lower court opinions, it did not establish a new rule or standard. Therefore, no issue of retroactivity arises, and the decision is to be applied retroactively. (*People* v. *Gilman, supra,* at pp. 764-765; see also *People* v. *Minichilli* (1984) 161 Cal.App.3d 660 [207 Cal.Rptr. 766], citing *People* v. *Caldwell, supra* 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274]; *People* v. *Henderson* (1985) 163 Cal.App.3d 1001 [209 Cal.Rptr. 883].)

Since *Beeman* must be applied retroactively, we look to the record to see if any exceptions exist to the necessity of a reversal.

The issue of what standard must be applied in determining whether error under *Beeman* is entitled to a per se reversal or should be decided pursuant to *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], or under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], has not yet been resolved by the California Supreme Court. (See our discussion in *People* v. *Gilman, supra,* at p. 765.) However, *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826] and *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], seem to indicate that a per se reversal is required unless certain exceptions are present.

In *People* v. *Garcia, supra,* 36 Cal.3d 539, our Supreme Court reviewed the United States Supreme Court decisions concerning jury instructions or failure to instruct the jury, which have the effect of removing from the jury the requirement of the state to prove every fact necessary for conviction beyond a reasonable doubt. The California Supreme Court reasoned that such error results in the denial of due process. (See *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]; and *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969].)

After reviewing the cases cited, *supra,* the California Supreme Court opined that at least eight justices of the United States Supreme Court would agree " 'that a jury instruction which does take an issue completely from the jury is reversible per se.' " (*People* v. *Garcia, supra,* 36 Cal.3d at p. 554.) In a footnote in *Garcia,* the court pointed out that error under *Beeman* "is just as effective—if not more effective—in removing the issue of intent from the jury's consideration." (*People* v. *Garcia, supra,* at p. 554, fn. 9.)

However, in *Garcia, supra,* 36 Cal.3d at pages 554-557, and later in *People* v. *Ramos, supra,* 37 Cal.3d 136, at pages 146-149, our Supreme Court recognized certain narrow exceptions to the requirement of a per se reversal. We need not reiterate all of the exceptions here, since only one

has any application to the facts of the instant case. That exception which derives its existence from the cases of *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256], and *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], does not require a reversal where " 'the record not only establishes the necessary intent as a matter of law but shows the contrary evidence not worthy of consideration.' " (*People* v. *Ramos, supra,* 37 Cal.3d 136, 146-147.)

This exception directly applies to the instant case. The only evidence presented at trial shows that both appellants jointly planned and carried out a robbery which resulted in the death of the victim. Ellis is responsible for the death under the felony-murder rule (see *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]) because he was a direct and active participant in a robbery which led to a murder. Under the evidence presented to the jury, aiding and abetting instructions were not even necessary. Even if the jury had been instructed pursuant to *Beeman,* the same result would have ensued, because Ellis was a direct and primary participant in the robbery. The jury could not have based its conviction on a theory of aiding and abetting given the evidence presented.

The fact that the deputy district attorney discussed the theory of aiding and abetting during his closing argument is of no moment. The jurors were properly instructed that the statements of counsel were not evidence (CALJIC No. 1.02) and that they should disregard any instructions which apply to a state of facts they found did not exist (CALJIC No. 17.31). Inasmuch as there was no evidence worthy of consideration that Ellis was an aider and abettor, and in fact the evidence showed he directly and actively committed a robbery, the *Beeman* error in this matter does not require a reversal.

## DISPOSITION

Both appellants were fairly tried and convicted. The judgment as to each is affirmed.

Klein, P. J., and Lui, J., concurred.

The petitions of appellant Ellis and respondent for review by the Supreme Court were denied September 19, 1985. Lucas, J., was of the opinion that the petitions should be granted.