[No. 44269. Second Dist., Div. Five. June 5, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRE M. UNDERWOOD, Defendant and Appellant.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Larry R. Pizarro, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FEINERMAN, P. J.**—Defendant, Andre M. Underwood, was convicted by jury of second degree murder (Pen. Code, § 187) and robbery (Pen. Code, § 211). An allegation of firearm use by a principal, whose arming was not an element of the crime charged, was found to be true regarding both offenses. (Pen. Code, § 12022, subd. (a).)

Defendant's motion for a new trial was denied and he was sentenced to state prison for fifteen years to life for the murder (count I), plus one year for the firearm allegation. Defendant was also sentenced to one-third of the midterm of one year on the robbery charge (count II), plus one year for the firearm allegation. The sentence on count II and the accompanying allegation were stayed pending completion of the sentence on count I, the stay then to become permanent. Defendant was given credit for 320 days in custody, including 107 days good time/work time.

Defendant contends that the trial court committed reversible error in four respects: (1) it failed to give proper jury instructions on aiding and abetting; (2) it failed sua sponte to define the term "accessory after the fact"; (3) it admitted two illegally obtained and prejudicial statements; and (4) it failed

to probe an instance of jury misconduct. Defendant also contends that the abstract of judgment requires modification.

In a published opinion, the judgment of conviction was affirmed, but the case was remanded to the trial court for preparation of a new abstract of judgment which would correctly reflect defendant's custody credits. The Supreme Court then granted a hearing and has now transferred the matter back to this court for reconsideration in light of *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392].

### BACKGROUND

On the afternoon of January 29, 1981, Tyrone Powell (Powell) and Darryl Williams (Williams) walked to a local wash house to "hang out." Kelvin Mackey (Mackey) and Shelton Vance (Vance) joined them there and the group decided to "mak[e] some money" by "[r]obbing somebody." Powell first secured a shotgun shell from a boy named Phil and then the four made their way to a friend's house to get a 12-gauge shotgun. Powell loaded the gun and the group proceeded to a cafe called "Parkers" to await a suitable victim. When none appeared, they retraced their steps through an alleyway and happened upon Joe Miyoshi (Miyoshi) as he was entering his van.

Upon seeing Miyoshi, Vance said, "[l]et's rob him." When the others declined, Vance took the shotgun and confronted Miyoshi by himself. Vance pointed the gun at Miyoshi and Miyoshi threw some money out the window of his van. Miyoshi then tried to back up the van, but he hit a telephone pole and stopped. Miyoshi opened a door of the van, threw out more money and begged Vance not to shoot him.

As Powell, and possibly Williams, joined Vance in picking up the victim's money, Mackey spotted defendant walking through the alley and called to him. Defendant approached Miyoshi's van and took the gun from Vance. As defendant held Miyoshi at bay, the others ran. Powell testified that he looked back and saw defendant shoot the victim, who died of a shotgun blast to the chest. Defendant then fled with the others to a friend's house, where the stolen money was divided.

On the night of the murder, an officer directed to the scene of the shooting saw three male youths running. He arrived at the murder location about a minute later and then tried to find the three youths he had just seen. When he spotted them a few minutes later, they were standing between some houses and all three began to run. The officer then set up a perimeter, closed off the area, got a helicopter and started searching for the individuals.

Defendant was caught by another officer and identified as one of the three youths. He was very short of breath and sweating quite profusely. Although defendant gave a false name, a police officer recognized him. He was taken into custody on an outstanding warrant for an unrelated juvenile offense and was placed with the California Youth Authority. At the time, he was only considered a witness to the Miyoshi robbery and murder.

The following day, January 30, an investigating officer questioned defendant about the Miyoshi incident. Defendant maintained that although he happened on the robbery as it was concluding, he had nothing to do with its commission or the victim's subsequent slaying. He also stated that he saw who had done the killing. On March 4, defendant gave a second statement to the police and admitted that he had taken a share of the victim's money, but denied all other participation in the crime. Before making the second statement, police received a letter authored by defendant which warned one of the other youths charged with the robbery/murder not to involve him further in connection with Miyoshi's death and to blame the shooting on a third party. It was because of this letter that police decided to interview defendant a second time. They did so after giving defendant his *Miranda* rights upon the advice of a deputy district attorney.

On May 29, 1981, defendant was arrested on the instant charges and transported to the county jail to await trial. He was tried as an adult with codefendant Darryl Williams. During jury deliberations, the original trial judge was temporarily replaced by a second trial judge who ruled on an instance of jury misconduct. The second judge was also seated when the jury reported that they were deadlocked after one day's deliberations. After the original trial judge returned and reread and explained some of the jury instructions, the jurors resumed their deliberations. They eventually hung on the issue of whether defendant had personally used a firearm in the course of the crime but found him guilty of all other charges.

DISCUSSION

I

Defendant contends that the trial court committed *Beeman* error in its instructions on aiding and abetting and that his convictions for robbery and murder must therefore be reversed.

In *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], the Supreme Court held that an aider and abettor must not only "act with knowledge of the criminal purpose of the perpetrator" but with "an intent or purpose either of committing, or of encouraging or facilitating

commission of, the offense." In the case at bar, the court properly instructed the jury on the knowledge aspect of aiding and abetting[1] but failed to instruct on the necessary element of intent as required by *Beeman*.

## THE ROBBERY

The testimony is undisputed that defendant happened upon a robbery in progress. When he arrived at the scene, force had already been applied to secure the victim's money and the victim had already surrendered most if not all of the money, with which the robbers eventually fled. Defendant argues that since he neither helped plan nor initiate the robbery, the jury could only have found him guilty on aiding and abetting principles. We disagree.

In a statement to police, defendant said that he took a share of the proceeds after he and the others reached a place of safety. He also reportedly told police that he saw Mackey picking up some of the victim's money off the ground, and that defendant indicated, "I'm going to get some, I'm going to get some too."

The defendant contends that the trial court committed reversible error in admitting two of his statements, including the comment above. He argues that he should have been advised of his *Miranda* rights before making the first statement and that the second statement which included his intent to get some of the victim's money, was not only the product of, and therefore tainted by, the first inadmissible statement, but was in derogation of his right to counsel. We discuss below the admissibility of his statements.

---

[1]The trial court's instructions on aiding and abetting included the pre-*Beeman* versions of CALJIC Nos. 3.00, 3.01 and 8.27, modified as follows:

"3.00 The persons concerned in the commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof include:

"1. Those who directly and actively commit the act constituting the crime, or

"[2. Those who, with knowledge of the unlawful purpose of the person who directly and actively commits the crime, aid and abet in its commission.

"One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged.]"

"3.01 A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime.

"[Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.] [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]"

"8.27 If a human being is killed by any one of several persons engaged in the perpetration of the crime of robbery, all persons who either directly and actively commit the act constituting such crime or who with knowledge of the unlawful purpose of the perpetrator of the crime aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional or accidental."

## A. *The First Statement*

Defendant was arrested on the night of the crime on an unrelated outstanding warrant. He was deemed a potential witness to the Miyoshi robbery/murder and an investigating officer interviewed defendant on that matter the following morning, January 30. The officer, Detective Johnson (Johnson), testified that defendant was listed somewhere in the original crime report on the Miyoshi incident as a witness. Since he considered defendant to be a witness rather than a suspect, Johnson said that he deemed it unnecessary to advise defendant of his *Miranda* rights. At the completion of his 30-minute taped interview with defendant, Johnson still regarded defendant's status as that of a witness. He was unaware of why defendant was being detained, except that the unrelated charge for which he was arrested had something to do with dissuading a witness.

Because defendant's constitutional rights were not waived prior to questioning, defendant's counsel moved to suppress the statement. The trial court denied the motion, finding that defendant was not a suspect at the time of the interview so that *Miranda* waivers were not required.

It has long been held that the necessity for administering *Miranda* warnings is not circumvented by the fact that questioning is undertaken of someone "in custody" on an unrelated charge. (*Mathis* v. *United States* (1968) 391 U.S. 1, 4-5 [20 L.Ed.2d 381, 385, 88 S.Ct. 1503].) Under *Miranda,* "the vital question is custody, not whether the investigation has focused on the person interrogated [citations], and it is immaterial that the questioning relates to a crime other than the one which triggered the custody and is investigatory as far as that offense is concerned." (*In re James M.* (1977) 72 Cal.App.3d 133, 136 [139 Cal.Rptr. 902].) However, the "questioning" must be interrogatory in nature—namely, questioning which is reasonably likely to elicit an incriminating response. (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301-302 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682].) Both the custodial and interrogatory aspects are necessary to trigger the requirement of a Miranda admonition.

On the record before us, it is highly unlikely that the interview could be deemed interrogatory in nature. However, even if it were deemed to be so, we do not find that the defendant was thereby prejudiced. Defendant's comments during the first interview were in the nature of an admission—a recital of facts which tend to establish guilt when considered with the remaining evidence in the case. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) He told Officer Johnson that he had been walking down an alley when Mackey yelled, "Come here." He followed Mackey to a van, where he saw Vance pointing a 12-gauge pump

shotgun at the victim whom he described as Japanese. Defendant then asked Vance, "What are you all doing, robbing Homeboy," to which Vance responded, "Yes. We are robbing him. We already robbed him. We got his money." Defendant told Johnson that he saw Vance grin and pull the trigger, whereupon defendant said he ran to his apartment.

While defendant placed himself at the scene of the crime, his statement was essentially exculpatory. He denied any involvement with the shooter or the shooting and said he derived no money from the robbery. ▮ Since defendant's statements constituted an admission, rather than a confession, the failure to give him his *Miranda* rights was not prejudicial error per se. (*People* v. *Maynarich* (1978) 83 Cal.App.3d 476, 481 [147 Cal.Rptr. 823].) The appropriate standard of review is whether the trial court's error was harmless beyond a reasonable doubt. (See, e.g., *People* v. *Kilpatrick* (1980) 105 Cal.App.3d 401, 413-414 [164 Cal.Rptr. 349], disapproved on other grounds in *People* v. *Bustamante* (1981) 30 Cal.3d 88, 102 [177 Cal.Rptr. 576, 634 P.2d 927].) We believe that it was.

Defendant's presence at the scene of the crime was uncontested during trial. The issue before the jury was not whether he was present on the night of the victim's death, because at least two witnesses unequivocally saw him there, but whether he was somehow involved with the crime or with the subsequent receipt of its fruits. Defendant's initial statement to police established no culpability on his part and provided only cumulative and therefore unnecessary evidence that he was indeed present the night of the victim's robbery/murder. We find beyond a reasonable doubt that the admission of defendant's first statement to police did not contribute to his conviction. Moreover, as is discussed below, we do not find that defendant's second statement was the impermissible byproduct of his earlier admission to police.

B. *The Second Statement*

On March 4, Detective Johnson took a second statement from defendant. Johnson initiated the second interview after having come into possession of a letter which defendant wrote to Vance. In it, defendant apparently asked Vance not to inculpate him in the Miyoshi incident and to blame the shooting on a third party, who defendant said was responsible for giving the police his name, as well as that of Vance and Mackey. Defendant's letter also warned that he would not beg Vance to refrain from telling on him but that Vance would "pay" whether defendant got out or not.

In closing argument, defense counsel said he wanted to discuss the letter with the jury for a minute because it was "what brought a whole lot of

problems onto Andre Underwood in this case, nothing else . . . ." Indeed, it was this letter, and not anything said in defendant's first interview with Johnson, which prompted Johnson to reinterview defendant. Thus, during the Evidence Code section 402 hearing, Johnson testified that when he spoke with defendant on March 4, he informed him that he was still investigating the Miyoshi murder and that he had in his possession a letter which was allegedly written by defendant and that he was "there to question him as to that letter" and as to why he wrote it.

■ As a general rule, "where an accused makes one confession and at a later time again confesses, it is presumed the second confession is a product of the first. . . ." (*In re Pablo C.* (1982) 129 Cal.App.3d 984, 989 [181 Cal.Rptr. 468].) This presumption stems from the notion that "'after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good [citation].'" (*People v. Spencer* (1967) 66 Cal.2d 158, 167 [57 Cal.Rptr. 163, 424 P.2d 715].)

■ The case at bench is distinguishable. First, defendant's initial statement amounted to no more than an admission. He made no declaration of his intentional participation in the criminal acts, as is required for a confession. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 756 [175 Cal.Rptr. 738, 631 P.2d 446].) He simply portrayed himself as an innocent bystander.

Second, at the time of the first interview, defendant did not stand as the accused. Johnson testified that when he first spoke with defendant on January 30, he was viewed as just one of a number of witnesses whom Johnson had interviewed in the hours immediately after the victim's death.

Third, the causal link between defendant's first and second statements was broken by defendant's own letter. It was defendant's threatening remarks in that letter and not his earlier admission which prompted Johnson to interview defendant again.

Finally, as will be noted below, defendant's second statement could not be deemed a confession to the crimes charged. While his comments were somewhat more self-incriminating, defendant was clearly not professing his intentional participation in the robbery and/or murder. In sum, we do not find that defendant's second statement was impermissibly tainted by the first.

■ Nevertheless, defendant maintains that his second statement was taken in derogation of his right to counsel. At the time of the second state-

ment, defendant was still in custody on the unrelated charge for which police had arrested him on the night of Miyoshi's death. Before conducting the second interview, Johnson checked with the deputy district attorney (D.A.) on the Miyoshi case, who was aware that defendant was represented by counsel on the other criminal matter. The D.A. advised Johnson that he could question defendant if the interview was limited to the pending investigation of the Miyoshi killing, and if there was a proper and voluntary waiver of defendant's *Miranda* rights. At some point, the D.A. conversed with defendant's attorney on the unrelated offense, during which occasion defendant's attorney tried to negotiate dismissal of the pending charges in return for appellant's testimony as a witness in People's case against Vance and Mackey.

As instructed by the D.A., Johnson gave defendant his *Miranda* rights and received a waiver. Thereafter, Johnson questioned defendant about the letter and about matters relating to the Miyoshi incident. Defendant stated that he was at the scene of the crime for approximately 50 seconds, during which time he saw Vance pointing a 12-gauge shotgun at Miyoshi while the others involved were picking up money off the ground. He also said that when he arrived, Vance told him that the robbery was already over and that Vance then pulled the trigger. Defendant admitted that he fled in the company of Vance, Mackey and two others, all of whom divided up the victim's money at the house of a friend. Defendant told Johnson that "he had something coming . . . [because] [h]e was involved; he was there [and] [s]hould therefore get something for all his trouble."

Defendant acknowledges that the police were not prohibited from questioning him upon the Miyoshi case, in the absence of counsel on the unrelated charge, once the valid *Miranda* waivers were obtained. He argues, however, that although the charged and uncharged crimes were not substantively related, that they were strategically intertwined and that the police should therefore have contacted defense counsel before initiating the second interview. Specifically, defendant claims that his counsel was trying to use his knowledge of the events surrounding the instant case to secure a dismissal of the already filed charges and that when police interviewed him, he was thereby deprived of any "bargaining chips." Defendant's argument is without merit.

First, it is unclear whether defendant's attorney spoke to the D.A. about the possibility of striking a deal *before* the second interview occurred. Second, the bargain sought was predicated upon the assumption that defendant would be a witness and not a defendant in the Miyoshi murder and robbery. The record does not suggest that defendant's attorney was also trying to negotiate immunity or other special consideration for defendant

on the Miyoshi-related charges, so that any erstwhile bargain would not have affected or otherwise prejudiced defendant's trial in the instant case. Any impact which the lack of representation and the loss of bargain may have had on defendant's other unrelated case is beyond the scope of our review.

■ With respect to the robbery itself, we note the court's jury instruction that a robbery is not deemed complete until the perpetrator reaches a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property. (CALJIC No. 9.15.) Here, by his own admission, defendant apparently decided to join the ranks of the robbers while the robbery was still in progress. Witness testimony indicates that defendant also held the shotgun with which the victim was eventually killed.

The defendant's acts and statements establish that he helped perpetrate the robbery and meant to effect its successful conclusion. His culpability as a perpetrator was therefore shown as a matter of law and the jury instructions on aiding and abetting were therefore inapplicable and unnecessary on the charge of robbery. (*People* v. *Hayes* (1985) 169 Cal.App.3d 898, 910-911.)

Our conclusion is supported by the Supreme Court's decision in *People* v. *Croy* (1985) 41 Cal.3d 1. In *Croy,* defendant presented evidence "through credible, neutral witnesses" that he did not make certain statements attributed to him by emergency room personnel, to the effect that he had been shot while committing a robbery. There was also "no evidence that defendant participated in any act which . . . aided the theft of [ammunition]" later used in the course of the murder with which he was charged. (*Id.,* at p. 15.) He merely "aided" the robbery by driving the actual perpetrators from the scene of the crime either to facilitate its commission "or *for some other purpose.*" (*Id.,* at p. 16, italics added.) Moreover, the record shows that defendant had consumed a "prodigious amount of mind-altering substances . . . for a period of three days preceding the shooting." (*Id.,* at p. 19.)[2]

In the case at bench, defendant does not deny making the statements attributed to him which placed him at the scene of the offenses and which carried the admission that he had taken a share of the victim's money. Unlike

---

[2]The evidence indicates that Croy had been intoxicated throughout the incidents leading to his arrest. He testified that when his friends emerged from the store where the ammunition was taken after an altercation with the store's owner, he became concerned when he saw police arrive because he "was on probation and was afraid that he would be arrested for being drunk. He stated that that was the reason he had driven away from the police and had attempted to avoid apprehension." (*Croy, supra,* 41 Cal.3d at p. 16.)

the defendant in *Croy,* defendant here was not a passive bystander to the robbery which led directly to the victim's death. As noted above, his participation in the crimes went well beyond "aiding" their completion. In the language of *Croy,* we find that there was "no plausible basis on which the jury could find that the defendant acted for another purpose" (*Croy, supra,* 41 Cal.3d at p. 16.), or that he was "incapable of recognizing his obligation to adhere to society's laws," due to prior intoxication. (*Id.,* at p. 20.)

Even if defendant's conviction rested on a theory of aiding and abetting the robbery rather than perpetrating its commission, we find no reversible error. In *Croy,* the Court analyzed situations involving *Beeman* error under former jury instruction, CALJIC No. 3.01. There, as in the case at bar, the instruction read in relevant part that "a person aids and abets the commission of a crime if, *with knowledge of the unlawful purpose of the perpetrator* of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime." (Italics added.) The Court in *Croy* stated that although defendant's intent was not specifically put in issue with this instruction, "the parties at least recognized that the defendant's state of mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose." (*Croy, supra,* 41 Cal.3d at p. 14.) "Thus," continued the Court, "there may be no unfairness in assuming—for purposes of appeal . . . that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given." (*Ibid.*)

Such is the instant case. Under former CALJIC No. 3.01, the jury could only have convicted defendant on an aiding and abetting theory if it found that he acted with knowledge of the criminal intent of the perpetrator(s) of the robbery, so that the *Beeman* error could not possibly have affected the verdict. That is, "no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime." (*Croy, supra,* 41 Cal.3d at p. 14.)

Given defendant's conceded presence at the crimes and his concern with certain statements he made to police, defendant clearly knew that his "state of mind was at issue," so that he had a "substantial incentive" to present any and all evidence available on the question of intent. In light of these circumstances and in conformance with the guidelines delineated in *Croy,* we affirm the conviction on the robbery count.

## The Murder

■ If defendant was as a matter of law an intentional perpetrator of the robbery, then it is equally clear as a matter of law that the killing was "committed in the perpetration of" the robbery (Pen. Code, § 189) as that statutory phrase has been construed by the cases. (1 Witkin, Cal. Crimes (1963) § 312, pp. 284-285, (1985 supp.) pp. 306-311.)

■ Where a defendant is guilty of first degree felony murder as a matter of law, there is no reason to reverse a second degree verdict which is more favorable to defendant than warranted by the evidence.

Given the state of the record in this case, the second degree verdict had to be the product, not of erroneous instructions or prejudicial confusion on the part of the jury, but rather of an attempt by the jury to show unwarranted leniency. Having already received the benefit of jury leniency not supported by the evidence, defendant is in no position to seek outright reversal.

In *People* v. *Powell* (1949) 34 Cal.2d 196, 205, 208 [208 P.2d 974], the defendant caused a death as a result of a criminal abortion, which constituted second degree murder, but was found guilty only of manslaughter. He argued on appeal that the trial court's finding was illogical and indicative of a doubt whether defendant was guilty at all. The Supreme Court rejected this argument, stating: "It cannot be doubted that a trier of fact has and often exercises the *power,* because of obvious extralegal factors or for no apparent reason, to find a defendant guilty of a lesser degree or class of crime than that shown by the evidence. Furthermore, even if it be assumed that the trier of fact erred here when he found defendant guilty only of manslaughter, defendant cannot invoke reversal on an error which is favorable to him." (*Id.,* at p. 205, italics in original, fn. omitted.) The court held that under such circumstances the judgment "more favorable to defendant than the view of the evidence taken by the trial court could support, should stand." (*Id.,* at p. 208.)

Similarly in *People* v. *Amick* (1942) 20 Cal.2d 247, 252 [125 P.2d 25], the defendant, acquitted of vehicular manslaughter but found guilty of negligent homicide, complained that the verdicts were inconsistent. The court likewise rejected this argument, finding "more persuasive cases recognizing that such inconsistent verdicts may be caused not by the confusion but the mercy of the jury, of which the appellant can neither complain nor gain further advantage." (*Ibid.* See also *People* v. *Brown* (1973) 35 Cal.App.3d 317, 326-328 [110 Cal.Rptr. 854].)

■ ■ ■ ■ ■ If defendant's culpability as a perpetrator of a felony murder was established as a matter of law, jury instructions on aiding

and abetting were therefore also inapplicable and unnecessary on the murder charge. (*People* v. *Hayes, supra,* 169 Cal.App.3d 898, 910-911.)[3] Alternatively, as noted above, even if defendant only aided and abetted the underlying robbery, the asserted *Beeman* error could not have affected the underlying robbery conviction, upon which a finding of felony murder would have been made.

## II

Defendant also contends that jury misconduct, coupled with an inadequate response by the trial court, deprived him of his state and federal constitutional rights. He maintains that he was denied a trial by 12 impartial jurors when 1 of the jurors brought a marked copy of the Penal Code with him during jury deliberations and when the court thereafter failed to require the prosecution to rebut a presumption of prejudice.

It is well settled that evidence secured by jurors from sources other than the trial court is misconduct. However, such misconduct will only constitute grounds for a new trial if the accused is thereby prejudiced. Prejudice is established when a fair and due consideration of the case has been prevented. (Pen. Code, § 1181.)

In the case at bar, the juror's copy of the Penal Code was not used in the course of deliberations. The book was apparently brought into the jury room on the third morning of deliberations, October 15.[4] Upon discovering the book, the foreperson told the offending juror not to use or refer to the code and to put it away. She then reported the incident to the bailiff, who immediately seized the book and brought it to the trial judge.

That afternoon, the trial court raised the matter by saying that Juror Abejar had evidently taken "it upon himself to do a little legal research and brought into the courtroom today and . . . into the jury room a copy of the 1982 Compact Edition of the Penal Code . . . . [¶] And he had marked Section 1104, which relates obviously to conspiracy. And he had the index marked . . . at 'conspiracy,' also. [¶] . . . And he has check marks by the word 'conspiracy' on page 1381 of the index, and he has a check mark by . . . Section 1104."

The trial court went on to note that the incident occurred about 10:30 a.m. and that shortly thereafter the bailiff brought the book to the court.

---

[3]Since we find as a matter of law that defendant was guilty of both robbery and murder, we find that the trial court had no sua sponte duty to define the term, "accessory after the fact."

[4]Jury deliberations actually began on October 6, 1982. However, they were started anew on October 13, 1982, after the court swore in the two alternate jurors.

The court said, "[i]t's now quarter till 2:00 . . . [s]o the jury has been in deliberations now since then and has not, so far as I know, had any book or anything to do with the law other than the copy of the [jury] instructions." The court then inquired whether anyone had "anything they'd like to raise?"

Defendant immediately moved for a mistrial and argued that when the juror ignored the court's instructions against doing independent legal research, his right to impartial deliberations by all 12 jurors had been unalterably compromised.[5] The trial court responded, "the problem is . . . you have to make some sort of showing that there has been some prejudice." Although the burden of proof is properly placed upon the prosecution and not the defendant in rebutting any presumption of prejudice (see *People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]), such prejudice may also be rebutted when a reviewing court's examination of the entire record discloses that there is no "reasonable probability of actual harm to the complaining party resulting from the [jury] misconduct." (*People* v. *Diaz* (1984) 152 Cal.App.3d 926, 934 [200 Cal.Rptr. 7].)

Here, the record shows that the sections marked by Juror Abejar related solely to the issue of conspiracy. While the question of conspiracy may have related to the case of the codefendant tried with defendant Underwood, nothing in the record suggests that defendant was ever charged with or portrayed as part of the conspiracy to murder and rob the victim, Miyoshi.

It should also be noted that on the day of Abejar's misconduct, October 15, Judge Henry P. Nelson, was sitting in place of the original trial judge, Judge Diane Wayne. When the jury was present on October 20, Judge Wayne had returned and told them that the case could only be decided on the law as provided in court. She further admonished the jury that "[n]obody saw what was in the Penal Code, but even if you had seen it, you will all disregard that and decide this case on the law as I gave it to you; is that right?" The jury answered affirmatively and was then allowed to continue their deliberations.

Given the court's admonition and the fact that the marked sections of the Penal Code were unrelated to the offenses charged, we find that nothing in Abejar's wrongful act contributed to defendant's conviction or that defendant

---

[5]Defendant declined all invitations by the trial court for defendant to undertake an examination of Juror Abejar or the jury's foreperson as to Abejar's misconduct. Defendant also refused to have the court undertake such an examination. Defendant's position was that the mere fact that Abejar brought a marked copy of the Penal Code into the jury room was misconduct and that "[w]hether or not the court want[ed] to make [an] inquiry [was] entirely up to it."

was denied a fair and full consideration of his case. (Pen. Code, § 1181.) The result of Abejar's independent act was not such as to "adversely affect the jurors' impartiality, lighten the prosecution's burden of proof, or contradict any asserted defense." (*People* v. *Bullwinkle* (1980) 105 Cal.App.3d 82, 92 [164 Cal.Rptr. 163], disapproved on other grounds in *People* v. *Laiwa* (1983) 34 Cal.3d 711, 725-728 [195 Cal.Rptr. 503, 669 P.2d 1278]; *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 22-25 [147 Cal.Rptr. 208].)

## III

Defendant contends that the abstract of judgment does not accurately reflect the oral pronouncement of the court and should be modified to reflect credit for 213 days served and 107 days good time/work time.

A review of the superior court record discloses only the second of a two-page abstract of judgment. It is obviously incomplete because it makes no reference to the murder charge against defendant and fails to record the 320 days of custody time with which the trial court credited defendant.[6] We therefore remand with directions that a new abstract of judgment be prepared to accurately reflect the court's oral pronouncement of credits.

The judgment of conviction on the murder and robbery counts is affirmed, but the matter is remanded to the trial court with directions to prepare a new abstract of judgment which reflects the fact that defendant is entitled to a total of 320 days of custody credits.

Ashby, J., and Eagleson, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 18, 1986.

---

[6]The reporter's transcript records that defendant would be afforded "credit for 213 days actual time served; 107, good time and work time for a total credit of 302 days." The proper arithmetic total should obviously have been 320 days, not 302.