[No. F005293. Fifth Dist. Nov. 7, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ELIGHA HARPER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Joan Cavanagh, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Eddie T. Keller, Eileen Ceranowski and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**AZEVEDO, J.\***—Defendant Eligha Harper appeals from his conviction by jury of second degree murder (Pen. Code, § 187);[1] the jury found true an allegation that defendant personally used a firearm in the commission of the offense (§ 12022.5). Following denial of his motions for a new trial based on juror misconduct or, alternatively, for reduction of the verdict to voluntary manslaughter, defendant was sentenced to 15 years to life in prison with a 2-year enhancement imposed for the firearm use, for a total term of 17 years to life.

On appeal defendant contends his conviction must be reversed because (1) the trial court erred in denying his motion for a new trial based on alleged juror misconduct, and (2) the prosecutor committed *Doyle* error (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]). Defendant also argues that the sentence imposed violates the constitutional proscription against cruel and unusual punishment. We disagree and affirm the judgment.

### FACTS

In June 1984 defendant, then 70 years old, moved into the apartment of 51-year-old Leroy Wilson at Wilson's request. Wilson was in poor health, and his doctor had advised against Wilson living alone. Defendant slept on the couch and paid Wilson $90 per month. In July 1984 Elena Garcia, who had lived with Wilson for about a month and a half earlier in the year, moved back to the apartment. Since defendant was already renting the couch, Garcia slept with Wilson in the single bedroom.

In the early morning hours of July 17, Garcia invited her friend Teresa Ortiz back to the apartment. Wilson and the defendant were both at home, and Wilson gave Garcia permission for Ortiz to stay. Garcia then introduced Ortiz to defendant. The four sat around talking, and Wilson and defendant drank Thunderbird wine. Garcia had brought some groceries and a second bottle of Thunderbird for Wilson. Garcia and Ortiz injected heroin in the bathroom of the apartment and stayed up talking to Wilson and defendant for about an hour before both women went to bed in the bedroom.

Garcia was awakened about 9 a.m. the next morning by a loud argument between Wilson and defendant. Defendant accused Wilson of having had sex with both women all night long and told Wilson that he, defendant,

---

\*Assigned by the Chairperson of the Judicial Council.
[1]All further statutory references are to the Penal Code unless otherwise indicated.

now wanted to have sex with either of them. Wilson came into the bedroom and told Garcia defendant was very drunk and acting crazy. Garcia heard defendant making threats to kill Wilson, herself, and Ortiz. Garcia and Ortiz left the bedroom and went into the bathroom, where both women again injected heroin. Although Wilson did not appear to be drunk, defendant appeared *very* drunk. After about 10 minutes the women came out of the bathroom, and Garcia went into the kitchen to make breakfast.

From the kitchen Garcia could see part of the living room where the argument between Wilson and defendant was continuing. She saw defendant reach toward the sofa where he slept. Ortiz ran into the kitchen from the living room, telling Garcia that defendant had a gun. Garcia and Ortiz then ran out of the apartment, and on their way out both heard two shots. The last time Garcia saw Wilson, he was seated in his reclining chair. Neither Garcia nor Ortiz saw Wilson with a gun; Garcia had not heard Wilson make any threats. The two women ran to a neighboring apartment to borrow some clothing for Ortiz, who was wearing only her bra and panties, and to call the police. Garcia heard more shots, five or six in all, and the shots came one right after another.

Garcia testified she was not sure that defendant had actually shot Wilson as opposed to firing the gun into a wall or floor to emphasize a bluff. Therefore, both women returned to the apartment. Garcia opened the door a crack, and she saw defendant sitting at the kitchen table with a gun and a bottle of Thunderbird in front of him. Ortiz, who peeked in the window, testified that defendant was reading at the kitchen table. Garcia called softly for Wilson but got no response. She then spoke to defendant, asking him to come over to the door and talk to her. Garcia wanted to get defendant away from the gun on the table so she could get into the bathroom and retrieve her purse which still contained about one-half gram of heroin, for which Garcia had paid $150. Defendant told her he had killed Wilson and instructed Garcia to call the police. Garcia was successful in getting to the bathroom, and she glanced into the living room where she saw Wilson "kind of slooped back" and not moving. Some time later Garcia did call the Mendota Police Department, where she spoke with Chief Pena and with Officer Betty Barker.

Officer Barker was dispatched to the Mendota Garden Apartments about noon on July 17 in response to reports of gunshots. She received further information through a dispatch, relaying a telephone call from Garcia, that a man had been shot in apartment No. 139. Barker telephoned apartment 139, and when she asked to speak with Wilson, the male who answered (later identified as defendant) said, "No." Barker asked, "'Poppy, is this. you?'"; defendant said, "'Yes'" and told Barker he had just shot his best

friend. Barker tried to talk him into coming out of the apartment, but defendant broke off the conversation without giving any explanation for the shooting. Barker called a second time. Defendant told Barker that Wilson did not need any medical attention because he was dead. He again stated he did not want to come out but wanted Barker to come into the apartment and said he would not hurt her. Barker advised she could not comply. Defendant finally agreed to come out of the apartment and did so about 1 p.m. when he was taken into custody.

While Barker was transporting defendant to the police station, he stated numerous times that he had killed his best friend, that he had shot him. At the police station Barker *Mirandized* defendant and defendant responded, "I don't need an attorney. I killed my best friend. I shot him." Defendant said nothing else about what had happened; he provided no details of the shooting.

Dr. Jerry Nelson, the pathologist who performed the autopsy on Wilson, testified Wilson had been shot five times. Nelson found no evidence of powder burns or powder tattooing and concluded that the muzzle of the gun was at least two feet away from Wilson when he was shot. None of the wounds would have caused instant death, and death ultimately resulted from one bullet wound which penetrated the brain. Nelson also testified that a blood sample taken from defendant about 4 p.m. on July 17 revealed a blood alcohol level of .20. Wilson's blood alcohol level measured .17.

Lieutenant Vernon Banta of the Mendota Police Department also responded to the Mendota Garden Apartments and, upon entering apartment 139 after defendant's arrest, Banta observed Wilson's body in the living room in a rocking chair. Banta located two guns in the apartment, one a .32 caliber which appeared to be empty and was located under the sofa pillows and the second a fully loaded .38 caliber found on the kitchen table. The .32 caliber had been recently fired, but the .38 caliber did not appear to have been fired. Banta also observed some rounds of ammunition sitting atop a television and two .357 bullets lying next to the victim. Banta recovered three expended bullets from the apartment, two of which were under the victim, and recovered three more bullets at the autopsy. All of the bullets Banta seized had been fired from the .32 caliber gun.

### Defense Case

Defendant testified in his own behalf. He had known Wilson since 1963. Although defendant had other housing arrangements in mind when he returned to Mendota, he accepted Wilson's invitation to stay with him. Defendant testified that Wilson owned three guns, a *.57 (sic)* Magnum, a .38

caliber snub-nosed revolver, and a .22 caliber German revolver. Because defendant cleaned the house, he knew where the guns were located. The .357 Magnum was kept in a broom closet, the .38 was kept under Wilson's bed pillow, and the .22 was kept in Wilson's reclining chair.

Early on July 16, Garcia offered to have sex with defendant for $20 so she could buy drugs. Although defendant protested because Garcia was Wilson's "woman," Wilson told defendant it was all right, and defendant "went through the motions." He then gave Garcia $20. Garcia left the apartment but returned for more money. When defendant refused to lend her the money, Wilson borrowed another $20 from defendant and left the apartment with Garcia. Wilson later returned alone with a six-pack of beer and a fifth of wine. Sometime after dark, Garcia returned with Ortiz. Although they were shaking and sick, defendant refused to lend either woman any more money until Wilson agreed to "stand" for $20 apiece; defendant told Wilson he would deduct it from the rent. The two women returned some time later and Wilson let them in. Garcia and Ortiz danced around the apartment in various stages of undress, injected heroin, and ultimately went to bed. Defendant went to bed about 4 or 5 a.m.

When defendant woke up, he decided to go and buy some beer, but he discovered that his wallet was missing from his pants. Defendant knocked on the bedroom door, and when Wilson answered, defendant told Wilson that one of the women had taken his wallet. Wilson went back into the bedroom, and defendant heard mumbling; then Wilson returned to the door of the bedroom and tossed defendant his billfold. Defendant had had eleven $20 bills in his wallet, of which only one remained. When defendant demanded the rest of his money, Wilson told defendant to get out of the house. Defendant persisted, and Wilson followed defendant into the living room. When Wilson sat down in his recliner and leaned over, defendant believed Wilson was going for the gun he kept in the chair. Defendant retrieved his own gun from under the sofa pillow and shot Wilson. Defendant believed Wilson would shoot him because defendant knew of Wilson's reputation for meanness and hatefulness and knew Wilson had shot at another man. The victim of this other shooting, 63-year-old Samuel Bridges, testified for the defense that Wilson had shot him in the face in an argument over a woman.

Defendant testified he had never told Officer Barker that he had shot Wilson because he thought Wilson was going to shoot him. When asked directly why he had shot Wilson, defendant responded, "[b]ecause I thought he was going to shoot me." Defendant further testified on cross-examination that although he told police repeatedly he had killed his best friend, he never mentioned anything about Wilson going for a gun. Defendant knew he fired his gun more than once but could not remember how many times.

DISCUSSION

I. *Did the trial court err in denying defendant's motion for a new trial based on allegations of juror misconduct?*

Defendant first contends the trial court committed reversible error in denying his motion for a new trial based on his allegations of juror misconduct. On the second day of jury deliberations, one juror, William McCaskill, attempted unsuccessfully to take a dictionary with him into the jury room but, nevertheless, recited to his fellow jurors the dictionary definition of murder which he had researched.

Initially, the Attorney General has conceded that these actions of Juror McCaskill did constitute misconduct as described by decisional law. █
"It is well settled that evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. [Citations omitted.] The misconduct creates a presumption of prejudice [citation omitted] which may be rebutted by a showing that no prejudice actually occurred [citations omitted]." (*People v. Martinez* (1978) 82 Cal.App.3d 1, 21 [147 Cal.Rptr. 208]; see also *People v. Pierce* (1979) 24 Cal.3d 199, 207-209 [155 Cal.Rptr. 657, 595 P.2d 91]; *People v. Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) Juror misconduct has also been found in "'statements made, or conduct, . . . or events occurring, either within or without the jury room, of such character as is likely to have influenced the verdict improperly.' [Citations omitted.]" (*People v. Neely* (1979) 95 Cal.App.3d 1011, 1020 [157 Cal.Rptr. 531].) In light of respondent's concession, the question for this court, therefore, is whether the presumption of prejudice arising from juror misconduct has been rebutted in the instant case.

The standard for appellate review of a claim of juror misconduct was recently articulated in *People v. Diaz* (1984) 152 Cal.App.3d 926 [200 Cal.Rptr. 77]. There the court stated in pertinent part: "'[S]ince jury misconduct challenges the fundamental rights to an unprejudiced jury and the fairness of the trial proceedings, this issue is an independent appellate issue to be adjudicated by this court based upon the whole record.' [Citations omitted.] . . .

". . . . . . . . . . . . . . . . . . . . . . . .

█ "Finally, a presumption of prejudice arises from any jury misconduct [citations omitted], which 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability

of actual harm to the complaining party resulting from the misconduct.' [Citations omitted.] 'Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.' [Citation omitted.] In determining whether the presumption of prejudice has been rebutted, 'it is clear that the usual "harmless error" tests for determining the prejudicial effect of an error (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 . . .; *People* v. *Watson* [(1956)] 46 Cal.2d 818, 836 . . .) are inapplicable. Convincing evidence of guilt does not deprive a defendant of the right to a fair trial [citation] since a fair trial includes among other things the right to an unbiased jury . . . .' [Citations omitted.]" (*People* v. *Diaz, supra,* at pp. 933-935; see also *People* v. *Neely, supra,* 95 Cal.App.3d at pp. 1020-1021; *People* v. *Martinez, supra,* 82 Cal.App.3d at pp. 21-22.)

Cases dealing with juror misconduct consisting of receiving evidence outside of court are really not applicable to this case because no "evidence" was received outside of court; rather, the misconduct complained of consisted of one juror's out-of-court research into the definition of murder.

■ In this regard, it is crucial, if not determinative, to keep in mind that the misconduct in this case was brought to the attention of the trial court *before* the jury had returned a verdict. Obviously, if such misconduct had been discovered after the verdict was rendered, the seriousness of the misconduct and its prejudicial impact on the jury would be difficult, if not impossible, to assess; thus the prosecution's burden to show such prejudice was rebutted would be almost insurmountable. However, when as in the instant case juror misconduct surfaces during deliberations and the trial court takes the opportunity to do all in its power to correct the error and obviate the prejudice, these efforts by the trial court become part of the record reviewable on appeal.

Defendant filed two juror declarations in support of his motion for a new trial, the first a declaration by John Durazo and the second by Sheri L. Johnson. The prosecutor, in turn, filed declarations in opposition to defendant's motion from all five male jurors on the panel, apparently because Durazo's initial allegations of racial bias were based on statements made by male jurors in the case.[2]

All the declarations state that on the second of two days of jury deliberation, one of the jurors recited a dictionary definition of murder which none of the declarants could recall, nor is the specific dictionary relied on

---

[2]Juror misconduct based on racial bias was abandoned as a ground for this appeal.

identified. Moreover, the declarations are consistent that the juror who offered the extrajudicial definition "which did not jibe with the instructions given by the court as to the definition of murder" was immediately cautioned by other members of the jury that his definition could not be considered. Sheri Johnson declared the jurors then requested a reread of part of the district attorney's closing argument. Although the initial declaration of John Durazo filed in support of defendant's motion for a new trial states that "[t]he juror who recited the dictionary definition of murder was not a juror who initially supported a verdict of first degree murder," this is contradicted by the declaration of Jury Foreman Russell Pulliam. Pulliam declares that McCaskill himself caused the delay in reaching a unanimous verdict by holding out for first degree murder when all other jurors had agreed the verdict should be second degree murder.

Given the nature of the misconduct, the jurors' declarations that the offending member was immediately cautioned about his improper conduct might not be enough to rebut the presumption of prejudice after the verdict. However, in the instant case the impropriety was called to the attention of the trial court during deliberations. On the second day, the jury resumed deliberations at 9:07 a.m. At 11:17 the jury sent out a note. The note stated: "'Judge Creede, we have reached a stalemate. Although you have read the instructions on first and second degree murder so many times, there is among us those who cannot understand it or are trying to interpret the law under their own definitions. Someone actually looked murder up in a dictionary. We cannot seem to change or clarify this thinking, even after hours of argument. What can we do? . . .'"[3]

Although defense counsel suggested to the court that this reading of an extrajudicial definition had tainted the jury, the court noted that "there are some types of misconduct that can be cured if they come to our attention in a timely manner. . . . This is the type that is, has the potential for being cured." When the jury was returned to the courtroom, the court gave them the following eloquent, cogent and off-the-cuff admonishment: "THE COURT: All right. Now, first of all, with regard to jurors bringing a dictionary or looking—or anyone looking up murder in a dictionary, anyone on the jury who has looked up murder in a dictionary should put aside the dictionary definition and not consider it.

"As a judge, I do not get my definitions of crimes upon which you or any jury would receive instructions from a dictionary. I receive it from the

---

[3]The prosecutor called to the trial court's attention the fact that the note from the jury initially referred to "'there is a juror,'" which was crossed out and changed to "'there is among us those.'"

statutes enacted by the legislature and by the decisions of the appellate courts, and not from a dictionary. Because we are dealing with sections of the Penal Code that define crimes, and those definitions of the crime are not contained in the dictionary. They are contained in the Penal Code as interpreted by court decisions.

"And therefore, anyone who would go to a dictionary definition is really violating your duties to decide the case on the law as given to you by the Court. So put aside anything you may have read—any juror has read in a dictionary or put aside anything that a juror has told you about a dictionary definition or what the dictionary says, because that is using a standard that is not one that has been adopted by the legislature. And is not one that is a definition that has either—that has been announced by the courts.

"And some of the definitions of crimes have, as stated in these instructions, they have been carefully reviewed by the legislature and the appellate courts on a frequent basis. Some are historical, some are not. But they have been reviewed to make certain that they are current. And in giving instructions to you, we have reviewed them to make certain that we are giving you the law as it existed on July 17th of 1984.

"All right. Now, well, with regard to Mr.—you may not consider any dictionary definition. You should put aside any discussion or consideration of it."

Defendant argues that the vote of 11 to 1 could have occurred after the introduction of the dictionary definition, thus suggesting those jurors who had earlier been inclined to a conviction for voluntary manslaughter may have been prejudicially swayed by the improper definition. However, the Johnson declaration indicates that the three-way jury split occurred at the end of the first day of deliberations, and no juror was subsequently heard to announce he or she was taking a compromise position in voting for second degree murder. In light of the trial court's strong and unequivocal admonition that the dictionary definition was not to be considered, the more reasonable inference is that the definition did not affect the jurors' deliberation to defendant's prejudice. In fact, the Pulliam declaration suggests that Mc-Caskill, who introduced the dictionary definition, was the lone holdout for first degree murder. If McCaskill was improperly swayed by the dictionary definition, it was an error to defendant's benefit, not his prejudice. Absent evidence to the contrary, a jury is presumed to follow the instructions of the trial court. Having been given a specific admonishment in light of misconduct by one of their members, it seems probable the jurors would more closely adhere to the instructions of the trial court and thus reduce

the chance for prejudice. (Cf. *People* v. *Underwood* (1986) 181 Cal.App.3d 1223, 1238-1240 [226 Cal.Rptr. 840]; see also *People v. Knights* (1985) 166 Cal.App.3d 46, 51-52 [212 Cal.Rptr. 307].)

At the conclusion of the hearing on defendant's motion for a new trial, the court reviewed the admonitions given to the jury and noted that it was unnecessary to rely on a presumption the jurors had followed the admonition when the declarations made clear there was no further discussion of the dictionary definition. The court then stated: "And therefore, we find by a standard of beyond a reasonable doubt that the presumption of prejudice which arises from the dictionary being brought by one of the jurors and, apparently, some initial discussion of a brief nature on the subject was rebutted by the fact that we were able to bring the jury in, admonish them, that that was not the way to do it.

"And we also take note of the additional instructions that the Court gave the jury on the definition of the degrees of murder, and all the additional instructions that they requested on the subject.

"So on that issue, the Court determines by a standard of beyond a reasonable doubt, as shown by the declarations and also our admonition, and the further instructions we gave the jurors, that the presumption of prejudice has been rebutted."

 We agree. The prosecution did successfully rebut the presumption of prejudice which arose when Juror McGaskill recited to his fellow jurors a dictionary definition of murder.

II., III.*

. . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Hanson (P. D.), Acting P. J., and Martin, J., concurred.

---

*See footnote on page 1420, *ante*.