Filed 9/7/16  P. v. Regaldo-Godoy CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>FRANCISCO REGALADO-GODOY,<br><br>      Defendant and Respondent. | A144357<br><br>(Sonoma County<br>Super. Ct. No. SCR-646697) |

The Sonoma County District Attorney timely appeals from the trial court's order granting defendant Regalado-Godoy's motion for a new trial based on newly discovered evidence.  (Pen. Code, § 1238, subd. (a)(3).)[1]  We affirm the trial court's order granting a new trial on counts 1 and 4, charging attempted kidnapping (§§ 664/207) and battery on a person with whom the defendant was in a dating relationship.  (§243, subd. (e)(1).)  We reverse the court's order and remand to the trial court for further proceedings on count 3, residential burglary.  (§§ 459/460.)

## STATEMENT OF THE CASE

On April 25, 2014, an information was filed in Sonoma County charging Francisco Regalado-Godoy with attempted kidnapping (count 1), making criminal threats (count 2), burglary of a residence occupied by Jane Doe (count 3), and misdemeanor battery against Jane Doe, a person with whom he was in a dating relationship (count 4),

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

on December 31, 2013. (§§ 664/207, subd. (a); 422; 459/460; 243, subd. (e)(1).) Defendant, who remained in custody, pleaded not guilty and did not waive time for trial. On May 28, 2014, the district attorney filed a first amended information in all respects identical with the original information except it alleged the residence was occupied by Maria Sanchez and Rafael Enriquez.

On June 3, 2014, defendant waived time to July 3, 2014, plus 30 days. On June 30, 2014, defense counsel moved for a continuance, citing investigative needs. Defendant stated he was unwilling to waive time, the motion was denied, and jury trial was confirmed for July 3, 2014. However, on July 3 the court found good cause to continue and defendant agreed to waive time to August 15, plus 10 days.

Jury selection commenced August 18, 2014, but on September 11, 2014, that jury panel was discharged and a second panel of jurors was called. A jury was sworn to try the cause on September 16, 2014.

The jury returned its verdicts on September 22, 2014. With respect to the attempted kidnapping and battery counts, the jury initially returned guilty verdicts on both the greater and lesser included offenses. The court ordered the jury to correct the verdict forms to accurately reflect its intentions. After a recess, the jury found defendant guilty of attempted kidnapping, residential burglary, and battery. The jury also found the burglary to be a violent felony in that a person other than an accomplice was present in the residence during the burglary. (§ 667.5, subd. (c).) The jury found defendant not guilty of making criminal threats. The jury was polled and confirmed its verdicts.

On November 26, 2014, defendant filed a motion for a new trial based on newly discovered evidence. The motion was heard and granted on February 4, 2015. This timely appeal by the district attorney follows.

## STATEMENT OF FACTS

Jane Doe is defendant's former girlfriend. They were "going out together" for six months, but she was only "in a relationship with him" for the first two months; the rest of the time they were "just friends." They were no longer dating on December 31, 2013.

A little before 6:00 a.m. on December 31, 2013, Doe was walking to her apartment from a hotel at which she had spent the night, due to threats she had received the day before. Defendant called her and they talked for two or three minutes. When she first noticed defendant, he was in his car. Two of his cars were parked near her apartment. One was a Saturn and the other was a Corvette, which was parked across the street from her apartment.

Defendant "came out from near [her] apartment and fell upon [her] with blows and no longer allowed [her] to say anything." Defendant pulled her from the end of the driveway near the mailboxes to the spot where the Corvette was parked. The entire time she was being dragged against her will to the Corvette she was so frightened she could not talk. Defendant had his hands on her neck and in her hair the entire time and was threatening her with death. He tried to force her to get into the Corvette. At that point she started screaming for help.

Doe's neighbor Maria, whom she did not know at the time, told defendant from the window in her apartment to let Doe go; Maria said she was going to call the police. Defendant then let go of Doe. Doe saw defendant get into the Corvette and drive to the left.

Doe ran to the laundry room. Defendant ran towards her, but Maria rescued Doe from the laundry room before defendant was able to get to her. Maria and Doe ran up the stairs to Maria's apartment with defendant following behind them.

They were unable to shut the door on defendant because he broke the door's locking mechanism. Maria called for Rafael, who also tried to close the door. Despite

3

their joint effort, defendant "was able to come into the apartment." According to Doe, by the time Rafael came to the door, defendant "was already inside."

While Doe cried, Rafael told defendant he should leave. Rafael, Maria, and defendant were speaking to each other in loud voices. Defendant did not touch her while she was in the apartment. He made no physical contact with Rafael. After about eight minutes, defendant left. After he left, Maria and Rafael called the police.

Doe spent seven hours at the hospital. She had a lot of inflammation in her neck, tachycardia, and a cut on her lip inside her mouth. She felt a lot of fear and could not breathe.

Both of defendant's cars were still in the vicinity of the apartments when Doe spoke with police. She showed the police the vehicles' location.[2] The Corvette's rear window was broken and the tires were slashed and flat.

On cross-examination, Doe gave conflicting accounts of prior assaults by defendant and others. She testified that on December 4 or 5, 2013, defendant took her to his house, threatened her with a knife and a firearm, and would not let her leave until 9:00 a.m. the next morning. On December 5, 6, or 7, 2013, Doe went to the police department on Sonoma Avenue in Santa Rosa to report that four men stopped her near her house, pointed a gun at her and got into her car. However, she made that up because she was afraid of defendant, but afterwards told them the truth. Upon further questioning, Doe testified she gave the two statements on different days. In the first report she told them about defendant, and then later she told them about the four men.

---

[2] Sonoma County Deputy Sheriff Gossett testified Doe pointed out a blue Saturn parked on the street parallel to the curb on Kenton Court in front of her residence. It was unlocked, and smelled of alcohol, with the keys in the ignition and the driver's seat in a reclined position with the headrest in the back seat. A black Corvette with a broken front windshield was parked in the parking area of the residence.

4

She forgave defendant after the incident on the December 5, but not after the incident on December 31.[3]

In May 2013, Doe called the police to come to her house; she asked them for a restraining order against her husband. When the police told her there was not enough information to arrest her husband, she said he pushed her. After speaking with both Doe and her husband, the police arrested her and her husband ended up getting a restraining order against her. As a result of her arrest, deportation proceedings were initiated. She got an attorney, posted bond, and was released. Her daughter was placed in foster care on December 6 after she made the report about the four men. She told police her daughter was in the back seat when the men got in the car.

Doe's immigration case was still pending on December 31. Doe understood that the conditions of a U-Visa were satisfied as long as she was a victim of domestic violence, had not done anything wrong in the United States, and cooperated with the prosecution of the domestic violence. A U-Visa would make the possibility of deportation go away. If she were deported while her daughter was in foster care, she did not know when she would see her daughter again.

Doe applied for a U-Visa after December 31. She thought she could get one because of her husband's domestic violence against her. However, that backfired when she was unfairly arrested for domestic violence instead of him.

Doe did not know Maria Sanchez before December 31. Afterwards, she met Maria in a Safeway parking lot. She asked Maria to write a reference letter for her immigration case, and a letter to her therapist about what happened on December 31. Since the incident, the two were speaking more often, though not about the incident.

---

[3] Doe told Sonoma County Deputy Sheriff Gossett she had not seen defendant since November 16 when he assaulted her on December 31. She did not mention an incident on December 4 to him.

Maria Sanchez corroborated much of Doe's testimony, although she also contradicted Doe on some details. Sanchez testified she was living with her then boyfriend, Rafael Enriquez, and her four children on December 31, 2013. Very early in the morning, about 4:00 or 5:00 a.m. while it was still dark, she was awakened by "some yells, very, very loud." She looked out the window; the lady was screaming, "Let me go, let me go, I'm not getting in your car." Defendant was force-walking Doe towards a black Corvette with a broken side window. Sanchez said she saw both defendant's hands around the woman's throat, as well as in her hair. Sanchez told the man to let the woman go or she would call the police. Sanchez did not see defendant punch Doe in the face, nor did she recall telling the police that she did, although she might have said that because she was so upset and afraid. She heard the car start; by the time Sanchez got downstairs to help Doe, the car was gone.

Sanchez asked Doe if she wanted to come to her apartment. Doe said she did. Then Sanchez saw defendant coming through the laundry room, following them. He was running and very angry.

Defendant tried to grab Doe as he ran behind them, telling Doe to come with him, he was going to take her away. When they reached the apartment, they tried to keep defendant out of the apartment, but they were unable to close the door on him. He was pushing the door open from his side and broke the lock.

Sanchez told him to "go away, get out" but defendant "didn't want to do that. He wanted to take the girl. He [said], 'I'm going to take her.' " Doe begged, "[D]on't let him take me, I don't want to go, I'm afraid, he told me he was going to kill me." Sanchez yelled for Rafael to come help them.

Rafael tried to talk defendant into calming down. Defendant grabbed Doe by the elbow. Sanchez told her 14-year-old daughter to call 911. Defendant said, "No, I'm going to go ahead and to call the police." He was in the apartment for seven to 10 minutes. Defendant drove away in the black car after the police were called. Sanchez

6

did not actually see that the car had a broken window; Doe told her while they were waiting for the police that defendant wanted to force her into the car through the broken window.

Sanchez did not know Doe before this incident. In January, Sanchez moved out of the apartment. She and Doe called each other. Later, Sanchez went to Doe's apartment, but she was not home. They eventually met in the Safeway parking lot and Sanchez wrote a reference letter for Doe's visa application, which was based on defendant's conduct and her ex-husband's. Sanchez testified: "I felt her pain as if it was my own pain because I had a similar experience. And I did not have anyone to support me. So when I saw this woman alone I remembered. [¶] . . . [¶] And I felt as if I was the one that was going through what she was going through."

Rafael Enriquez confirmed Sanchez's testimony about their living situation on December 31 and at the time of trial. He corroborated he was awakened while it was still dark by someone coming into the apartment. Maria and Doe were pushing at the front door. Defendant was outside, "forcing at the door." Enriquez told defendant to stop, but he broke the door and the lock and forced his way in.

Enriquez did not know defendant or the girl. The girl was very frightened. Defendant did not touch Doe while Enriquez was there. Once defendant got inside the apartment, the two men struggled, because defendant "wanted to get at her." Defendant indicated he was going to call the police and seemed to be talking into a telephone. Enriquez called the police at the same time. Defendant finally left after about 10 minutes.

Enriquez knew Doe lived across the street, but never learned exactly where she lived, and he has not spoken to her since this incident occurred, except to exchange greetings at court proceedings.

*Defense Case*

On May 19, 2013, Santa Rosa police officer Marlee Wellington responded to a dispatch about a verbal argument reported by Doe. Officer Wellington arrested Doe.

On December 7, 2013, Santa Rosa police officer Todd Robert took a detailed report from Doe about suspects who had gotten into her car and made threats towards her and her husband on December 2, 2013. She did not mention anything about being kidnapped overnight and threatened with a gun and a knife on December 5.

On December 31, 2013, Deputy Gossett asked Sonoma County Sheriff's Deputy Ager to attempt to locate a report by Doe of a possible kidnapping or threats made to her. He located one such report regarding four unknown suspects dated November 16, 2013. There were no other reports. Deputy Ager also interviewed Maria Sanchez. She told him she saw defendant strike Doe in the face several times with his fist. Deputy Ager took photographs of Doe. He did not observe any visible injuries to Doe.

*The Motion for a New Trial*

Defendant's motion was based on the declarations of public defender investigator Carlos Carrera and two of defendant's friends, Francisco Quintero and Wilson Hernandez.

Quintero averred he has known defendant for a few years and considered him a friend. On December 30, 2013, he, defendant, Wilson Hernandez, Wilson's girlfriend, and a friend of Wilson's girlfriend, were at a friend's house. Everyone spent the night at the friend's house except him. Early in the morning on December 31, defendant called him to say he needed help moving his Corvette, which had been vandalized. Quintero reluctantly agreed to help, because he had to be at work at 8:00 a.m. He picked up defendant at the friend's house. Defendant asked Wilson to come along in defendant's Saturn. When they arrived at Kenton Court where the Corvette was parked, Quintero saw the car had broken windows and got out of the car to assess the damage. Wilson then arrived in the Saturn, parked on the street and said he would be dozing in the back seat.

8

They decided the Corvette needed to be towed and Quintero used his phone to Google the phone numbers of potential tow companies.

At that point, a woman approached them from the direction of an apartment building. She spoke to defendant, and began to say something about him having photos of another woman on his phone. "[T]he woman began to raise her voice and make a scene."

Quintero "urgently" told defendant they needed to leave. The woman said she would call the police if they left. This made Quintero even more anxious to leave because he did not want to deal with police. Quintero went to where Wilson was sitting in the Saturn and told him they needed to leave. Wilson got out of the Saturn and they all left in Quintero's vehicle. Quintero recalled Wilson said he left the keys to the Saturn in the ignition. Quintero never saw defendant touch or threaten the woman.

Later, he became aware that defendant was arrested, but he had no idea the arrest related to the events of December 31, 2014. During part of the summer of 2014, Quintero was outside Sonoma County and had unreliable cell phone reception. He did recall receiving a message from Carlos Carrera; however, he did not know what it was about and was too scared to return the call.

Wilson Hernandez averred he has known defendant for seven years and considered him a friend. He was under the impression that defendant was dating a woman named Doe and had briefly observed them interact on three occasions. On December 30, 2013, he was at a friend's house with his girlfriend, Quintero and defendant. Quintero left at about 2:00 a.m. He returned later that morning to help defendant deal with his vandalized Corvette. Defendant went with Quintero in Quintero's van and Hernandez went with his girlfriend in defendant's Saturn. They drove in separate cars because Quintero had to go to work afterwards.

Hernandez dropped off his girlfriend and then drove to Kenton Court, where defendant's Corvette was located at some apartments. Defendant and Quintero were

9

already there talking outside Quintero's van. Hernandez was very tired and got into the back seat of the Saturn to rest while other two dealt with the Corvette. Several minutes later, Quintero knocked urgently on the Saturn's window and said they needed to leave right away. Hernandez got out of the Saturn and "saw that [Doe] was yelling something as she grabbed onto Mr. Regalado-Godoy. He broke free of her grasp and went to where I was standing and said we needed to leave because [Doe] said she was calling the police." They got into Quintero's van and left. In his haste, Hernandez inadvertently left the keys to the Saturn in the ignition.

Defendant "never struck [Doe]." On the contrary, it appeared that Doe was aggressively grabbing onto defendant, and defendant was trying to break free of her grasp.

Carrera averred that in July 2014 he received a handwritten list of potential witnesses, including Quintero and Hernandez, and began the process of trying to contact them all. He had telephone numbers for the two men. He left a message for Quintero, asking for a return call, but he did not receive a call back. The number for Hernandez was not in service.

Carrera subsequently developed information that Quintero might be living at an address in Santa Rosa, and went to that address on September 16; no one was home. He left a card but received no response. On August 18, 19, and 20, Carrera attempted to obtain current contact information for Hernandez through mutual acquaintances of defendant and Hernandez, but his efforts proved unsuccessful.

After defendant's trial ended, Carrera learned that Quintero may have been out of the area during the time Carrera was attempting to contact him. On October 18, he left a message for Quintero asking for a call back.

On October 20, Carrera received information about a current contact number for Hernandez. He called that number the same day and spoke with Hernandez. They agreed to meet on October 22, but Hernandez did not show up.

10

The next day, October 23, Quintero called Carrera back and informed him that he (Quintero) was living in Lake County. Carrera conducted a phone interview at that time and interviewed Quintero in person in Lake County on November 4, 2014. Carrera interviewed Hernandez in person on November 10, 2014.

## DISCUSSION

### *The Standard of Review*

The district attorney argues the trial court committed reversible error by granting defendant a new trial on grounds of newly discovered evidence. A defendant may seek a new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, par. 8.) "The standard of review of an order denying a motion for a new trial based on newly discovered evidence was established by this court in 1887: 'To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' " (*People v. Martinez* (1984) 36 Cal.3d 816, 821 (*Martinez*).) "The granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court, and in determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." (*People v. Hill* (1969) 70 Cal.2d 678, 698; accord, *People v. Dyer* (1988) 45 Cal.3d 26, 52 (*Dyer*); *Martinez*, at p. 821).)

The district attorney argues we should review the trial court's order granting a new trial on the ground of newly discovered evidence de novo, rather than apply an abuse of discretion standard, because such motions are said to be "disfavored." (*People v. Byrne* (1911) 160 Cal. 217 (*Byrne*).) According to the district attorney, new trial motions based

on newly discovered evidence contradict the public policy in favor of finalizing litigation. However, it also could be said that the grant of a new trial on *any* basis undermines that policy. The district attorney also argues that granting a new trial for newly discovered evidence provides criminal defendants a disincentive to produce all their evidence at one trial. Nevertheless, both criminal defendants and disappointed civil litigants may seek a new trial "on specified grounds affecting the fairness of the prior proceedings," including newly discovered evidence. (*People v. Ault* (2004) 33 Cal.4th 1250 (*Ault*), § 1260, Code Civ. Proc., § 657, par. 4.)

The due diligence requirement, common to both civil and criminal new trial motions, protects against abuses. Moreover, as the *Byrne* court recognized, "When due diligence on the part of defendant to produce at the trial all evidence in his favor has been shown, the trial judge is still called upon, in the exercise of a wise discretion, to determine the weight to be given to the evidence produced upon the motion for a new trial, the truth of the matters shown thereby, and the materiality and probability of the effect of them if believed to be true." (*Byrne, supra,* 160 Cal. at p. 226.)

"[T]he weight of modern California authority is that the trial court's order granting a new trial will not be disturbed if fairly debatable, even if the reviewing court itself, addressing the issues de novo, would not have found a basis for reversal. [Citations.] In particular, the traditional rule is that the reviewing court will not substitute its judgment for the trial court's determination that *error was prejudicial,* and thus warrants a new trial." (*Ault*, *supra*, 33 Cal.4th at p. 1263.) Although the new trial order at issue in *Ault* involved juror misconduct (*id.* at p. 1272), the court did not limit its holding or observations to that basis alone. The *Ault* court observed: "A trial court's finding of prejudice is based, to a significant extent, on ' "first-hand observations made in open court," ' which that court itself is best positioned to interpret. [Citations.] Thus, where the effect of the ruling below is simply that the case will be retried free of the error or misconduct that infected the original proceeding, we may conclude that ' "the concerns of

12

judicial administration tip in favor of the trial court" ' [citation] and suggest a deferential standard of appellate review." (*Ault,* at pp. 1267–1268.)  In any event, as noted above, the Supreme Court in *Hill, supra*, 70 Cal.2d at page 698, *Dyer, supra*, 45 Cal.3d at page 52, and *Martinez, supra*, 36 Cal.3d at page 821, all cases involving newly discovered evidence, indicate an abuse of discretion standard is to be applied to all applications for a new trial made on this ground, irrespective of the outcome.  Even if we were persuaded by the district attorney's argument, which we are not, as an intermediate appellate court we are bound by our Supreme Court's determination that the trial court's grant of a motion for a new trial under section 1181 is governed by an abuse of discretion standard. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### *Due Diligence*

The trial court found Carrera's declaration established both that due diligence was exercised to locate the witnesses and that the evidence was newly discovered.  The court accepted Carrera's representation that defendant "clearly provided the information to his defense attorney and to the investigator with regard to the contact names and telephone numbers," and that Carrera undertook all reasonable steps to contact the witnesses but met with "roadblocks."  Because the leads Carrera was given turned out to be dead ends, the court believed a continuance would not have cured the problem, given that Carrera "had exhausted his attempts at location based on the only information that Mr. Regalado-Godoy had for them at that time."  Further, the fact that defendant "was in custody for this entire period of time" adequately explained why defendant was not "having contact with them or staying in touch with them so that he would have received from them any new or different contact information."  Upon Carrera finally making contact with these witnesses, it was apparent to the court that the witnesses had new evidence to produce.

The district attorney argues the trial court erred in finding due diligence.  She does not maintain that *Carerra*'s investigative efforts were lackluster.  Indeed, Carerra's continued efforts and eventual success in finding Quintero and Hernandez attest to his

diligence. Instead, the district attorney argues *defendant* failed to use "reasonable diligence to discover and produce Quintero and Hernandez for trial," noting that close to five months elapsed from indictment until defendant provided his attorney with the witnesses's names and phone numbers, and the witnesses were defendant's good friends. We disagree.

Defendant was not formally charged with the crimes he was accused of committing on December 31, 2013, until three months later when, on March 4, 2014, a complaint was filed. He appeared in custody for arraignment on that date. He was not arraigned on a first amended information until May 28, 2014. At that time, defendant entered into a limited time waiver to July 3, 2014, plus 30 days. The trial court was entitled to infer from the charging delay and defendant's custodial status that defendant gave his attorney what contact information he had for his witnesses in a timely fashion, since his attorney gave the contact information to investigator Carrera in July 2014, as soon as it appeared trial was imminent. The court was not unreasonable in concluding that defendant's ongoing custody impeded his ability to contact his potential witnesses or otherwise obtain updated information about their whereabouts and phone numbers.

Furthermore, since defendant remained in custody, time was of the essence to him. On May 28 he waived time until July 3, plus 30 days, but when defense counsel moved for a continuance on June 30, citing investigative needs unrelated to Hernandez and Quintero, defendant refused to waive any more time, and trial was confirmed for July 3. When, on July 3, the court found good cause to continue, defendant agreed to waive time only until August 15, plus 10 days. Thus, substantial evidence in the record supports the trial court's conclusion a continuance would not have changed the situation, given that investigator Carerra was operating within a short time frame and had exhausted his leads. In our view, substantial evidence supports the trial court's due diligence finding and no abuse of discretion is shown.

14

## Probability of a Different Outcome

The district attorney argues the trial court erred in finding that Quintero's and Hernandez's testimony would have made a different, i.e., more favorable, result probable. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.) In this context, "a hung jury is considered a more favorable result than a guilty verdict." (*Id.* at p. 520.) Thus, "when a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*Id.* at p. 521.)

The district attorney argues that the witnesses' testimony would not have made any difference because Doe's, Sanchez's and Enriquez's testimony independently established the elements of the charged offenses and, since Sanchez and Enriquez were strangers to Doe, neither had had any discernible motive to fabricate their testimony. Moreover, she asserts defendant did not "attack Maria's or Rafael's credibility at trial." She further argues Hernandez's declaration could not have undermined the prosecution witnesses's accounts because he was asleep during the better part of the incident and, while Quintero's declaration did contradict the victim, neither man mentioned Maria or Raphael, and both were long-time friends of defendant.

The trial court found: "[T]his case is essentially a case about credibility. The People's case that was put on was [rife] with inconsistent statements by the People's witnesses, and in the event that the defense as put forth by the defendant, and the declarations that have been submitted, directly contradict that version of events. And given that we had three witnesses testify at the time of trial, all who gave very differing scenarios about what occurred. And also the named victim in the matter, her own credibility issues, I think were there another scenario presented that there is a probability of a different outcome in this case."

15

With respect to the attempted kidnapping and battery counts, we see no abuse of discretion. Quintero's and Hernandez's declarations both contradicted critical aspects of Doe's and Sanchez's versions of the events and presented a plausible alternative explanation of the evidence about the confrontation on the street. Both Quintero and Hernandez heard Doe yelling at defendant and making a scene. Sanchez was awakened by the sound of Doe's loud voice. According to Quintero and Hernandez, the trio left the scene in a hurry in Quintero's vehicle and (according to Hernandez) left the Corvette parked "on Kenton Court at some apartments." According to Sanchez, defendant had already left the scene before she went down into the street. Deputy Gossett testified the Corvette was parked in the parking area of the residence, and the Saturn was parked on the street, unlocked, with the keys in the ignition, and the driver's seat in a reclined position with the headrest in the back seat. Deputy Ager took photographs of Doe's neck, but did not observe any visible injuries. None are visible in the pictures included in the appellate record, except a possible mark on the *inside* of Doe's upper lip.

On the other hand, as the trial court observed, the credibility of Doe and Sanchez was severely tested by the defense. Sanchez gave conflicting testimony about where she claimed to see defendant's hands. Although she testified she saw the black Corvette with a broken side window, she later admitted she never saw the broken window on the Corvette but heard about it from Doe while waiting for the police to arrive. She testified she saw defendant drive away in the black car after the police were called. However, the police located the black Corvette at the scene. According to Deputy Ager, she told him defendant beat Doe about the face with his fists. Sanchez testified she never saw that, but admitted she might have said she had in the excitement of the moment. Finally, although Sanchez did not know Doe before the incident, it was obvious from her testimony she later befriended Doe and felt solidarity with her as a fellow victim of domestic violence.

Doe's credibility was likewise challenged. She admitted lying to the police about a made-up incident in which four assailants entered her car and threatened her life and

16

her husband's. She said she reported another instance of domestic violence by defendant in early December, but no such report was ever found. Finally, defense counsel's cross-examination also exposed a powerful motive on Doe's part to invent or hyperbolize domestic violence reports against her husband and defendant in order to normalize her immigration status and regain custody of her daughter. In the case of her husband, the presumably false report of domestic violence backfired and she had been arrested instead. Under these circumstances, we cannot say the trial court abused its discretion in concluding it was reasonably probable at least one juror would conclude there was a yelling match on the street between defendant and Doe, which Sanchez did hear, but defendant did not batter or attempt to drag Doe into his Corvette against her will at that time.

However, the trial court's statement of reasons fails to explain how the Hernandez and Quintero declarations contradicted the evidence on the burglary count, or why Enriquez's testimony suffered from the same credibility problems that plagued Sanchez and Doe. Quintero's and Hernandez's proposed testimony extended only to what happened on the street. Neither witness offered any testimony about what happened after they drove off in Quintero's van. The declarations did not exclude the possibility that defendant was dropped off a short distance away, only to double back to the apartment in time to harass Doe near the laundry room and in the Sanchez/Enriquez apartment. Nothing in the declarations contradicted or explained that evidence or exposed a gap in the prosecution's case. Accepting there were discrepancies between the Sanchez, Doe, and Enriquez versions of exactly what happened in the apartment, Enriquez's testimony, standing alone, established that defendant literally broke into his apartment in order to take Doe outside against her will. Photographs admitted at trial showed the damage to the door and lock. Although defense counsel questioned Enriquez about asserted discrepancies between his statement to the police and his testimony, counsel did not succeed in shaking Enriquez's testimony concerning the core elements of the offense, or

17

in showing that the discrepancies, if any, were material. Nor did counsel bring in a police officer to impeach Enriquez's testimony, as he did with Sanchez and Doe.

Moreover, the evidence did not suggest Enriquez had a motive to lie or a bias toward Doe. Enriquez testified he did not know Doe before the December 31 incident, and was merely on cordial terms with her at the time of trial. No evidence undermined that testimony. Neither did the evidence show Enriquez was particularly close to Sanchez at the time of trial. She had moved out of the apartment shortly after the incident on December 31.

The trial court's factual findings, express or implied, made on a motion for a new trial will be upheld if supported by substantial evidence. (*People v. Drake* (1992) 6 Cal.App.4th 92, 97.) In this case, the trial court's conclusion that the Hernandez and Quintero declarations would probably lead to a better outcome on the burglary charge is not self-evident, and the trial court's stated reasons do not help us pinpoint the facts in the record supportive of the trial court's conclusion. (See *People v. Taylor* (1993) 19 Cal.App.4th 836, 848 [court's statement failed to articulate basis for conclusion that insufficient credible evidence supported the verdict; grant of new trial vacated].) A trial court has the power to grant a new trial as to some but not all of the counts charged in the accusatory pleading. (*People v. Drake*, at p. 99.) We find the trial court's ruling in favor of a new trial on the burglary count is not supported by substantial evidence, and reverse the court's order insofar as it grants a new trial on the burglary count. As to the attempted kidnapping and battery counts, the court's order granting a new trial is affirmed.

### DISPOSITION

The judgment (order granting a new trial) on count 3, burglary, is reversed and the court is ordered to reinstate the verdict. In all other respects the order granting a new trial is affirmed.

18

_____
DONDERO, J.

We concur:


_____
MARGULIES, Acting P. J.


_____
BANKE, J.

A144357